**RECEIVED**

SEP 09 2019

CLERK, U.S. DISTRICT COURT
FERGUS FALLS, MINNESOTA

1
Ryan Edner
44163 Hawes Beach
2
Rd Ottertail, MN
US 56571

3

FEDERAL COURT OF
4
MINNESOTA

5
                                              ) Case No.: 19 cv 2486 NEB/LIB
6
Ryan C. Edner                                 )
                                              )
7
          Plaintiff,                          )
                                              )                CIVIL
8
     vs.                                      )             COMPLAINT
                                              )
9
(see attached list of Defendants )           )
                                              )
10
          Defendants                          )

11        Plaintiff Ryan Edner brings forth the following causes of action and alleges the

12   following:

13   1.    Plaintiff is an individual and resident of Ottertail, Minnesota.

14   2.    Defendants are Government Employees, Criminal Defense Attorneys and Public

15   Defenders.

16   3.    On or about September 1st, 2015 and continuing through the present day, the

17   Plaintiff has been involved in an ongoing Criminal Case #64-CR-15-648 in which the

18   Defendants have recklessly and intentionally conspired to deprive the Plaintiff of his

19   Civil and Constitutional Rights.

20

21        Plaintiff brings forth the following count and allegation supporting his

22   cause of action.

23   **Count – Conspiracy Deprivation of Rights Under Color of Law**

24   The Principle of Fundamental Fairness: The Court has held that practically all

25   the criminal procedural guarantees of the Bill of Rights —the Fourth, Fifth, Sixth,

26   and Eighth Amendments—are fundamental to state criminal justice systems and that the

27   absence of one or the other particular guarantees denies a suspect or a defendant due

28   process of law under the Fourteenth Amendment. In addition, the Court has held

29   that the Due Process Clause protects against practices and policies that violate

30   precepts of fundamental fairness, even if they do not violate specific guarantees

SCANNED
SEP 10 2019
U.S. DISTRICT COURT FF

of the Bill of Rights. The standard query in such cases is whether the challenged practice or policy violates "a fundamental principle of liberty and justice which inheres in the very idea of a free government and is the inalienable right of a citizen of such government." In addition, the Court has held that the Due Process Clause protects against practices and policies that violate precepts of fundamental fairness, even if they do not violate specific guarantees of the Bill of Rights. The standard query in such cases is whether the challenged practice or policy violates "a fundamental principle of liberty and justice which inheres in the very idea of a free government and is the inalienable right of a citizen of such government."

Due Process Violations: Under both the Fifth and Fourteenth Amendments to the U.S. Constitution, neither the federal government nor state governments may deprive any person "of life, liberty, or property without due process of law." "The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. It, of course, tends to secure equality of law in the sense that it makes a required minimum of protection for every one's right of life, liberty, and property, which the Congress or the Legislature may not withhold."

The Requirements of Due Process: Although due process tolerates variances in procedure "appropriate to the nature of the case,"1 it is nonetheless possible to identify its core goals and requirements.

First, "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."2

Thus, the required elements of due process are those that "minimize substantively unfair or mistaken deprivations" by enabling persons to contest the basis upon which a state proposes to deprive them of protected interests.3

The core of these requirements is notice and a hearing before an impartial tribunal. Due process may also require an opportunity for confrontation and cross-examination, and for discovery; that a decision be made based on the record, and that a party be allowed to be adequately represented by counsel.

1 Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).

2 *Carey v. Piphus*, 435 U.S. 247, 259 (1978). "[P]rocedural due process rules are shaped

by the risk of error inherent in the truth-finding process as applied to the generality

of cases." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976).

3 *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). At times, the Court has also stressed the

dignitary importance of procedural rights, the worth of being able to defend one's

interests even if one cannot change the result. *Carey v. Piphus*, 435 U.S. 247, 266–67

(1978); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); *Nelson v. Adams*, 529 U.S.

460 (2000) (amendment of judgement to impose attorney fees and costs to sole shareholder

of liable corporate structure invalid without notice or opportunity to dispute).

## 42 U.S. CODE § 1983. RIGHT TO CIVIL ACTION

### TITLE 18, U.S.C., SECTION 242 – DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

This statute makes it a crime for any person acting under color of law,

statute, ordinance, regulation, or custom to willfully deprive or cause to be

deprived from any person those rights, privileges, or immunities secured or

protected by the Constitution and laws of the U.S.

This law further prohibits a person acting under color of law, statute,

ordinance, regulation or custom to willfully subject or cause to be subjected

any person to different punishments, pains, or penalties, than those prescribed

for punishment of citizens on account of such person being an alien or by

reason of his/her color or race.

Acts under "color of any law" include acts not only done by federal, state, or

local officials within the bounds or limits of their lawful authority, but also

acts done without and beyond the bounds of their lawful authority; provided

that, in order for unlawful acts of any official to be done under "color of any

law," the unlawful acts must be done while such official is purporting or

pretending to act in the performance of his/her official duties. This definition

includes, in addition to law enforcement officials, individuals such as Mayors,

Council persons, Judges, Nursing Home Proprietors, Security Guards, etc., persons who

are bound by laws, statutes ordinances, or customs. Punishment varies from a fine or

imprisonment, or both, and if bodily injury results or if such acts include the use,

attempted use, or threatened use of a dangerous weapons, explosives, or fire shall be

fined or imprisoned up to ten years or both, and if death results, or if such acts

include terrorism, treason, kidnapping or an attempt to kidnap, aggravated sexual

abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be

fined under this title, or imprisoned for any term of years or for life, or both, or

may be sentenced to death.

102  18 U.S.C. §1951 "Interference with commerce by threats or violence (a) Whoever in

103  anyway or degree obstructs, delays, or affects commerce or the movement of any article

104  or commodity in commerce, by robbery or extortion or attempts or conspires to do, or

105  commits or threatens physical violence to any person or property in furtherance of a

106  plan or purpose to do anything in violation of this section shall be fined under this

107  title or imprisoned not more than twenty years, or both.(b)As used in this section—

108  2)The term "extortion" means the obtaining of property from another, with his consent,

109  induced by wrongful use of actual or threatened force, violence, or fear, or under

110  color of official right."

### FACTS

112  **Jason Jacobson of the Redwood County Sheriff's Department on or around September**

113  **1st of 2015 committed misconduct and intentionally deprived the Plaintiff of his Civil**

114  **and Constitutional Rights Under Color of Law.**

115  Jason Jacobson failed to properly investigate an allegation of a crime as required by

116  state and federal law.

117  Jason Jacobson failed to follow police procedure as required by state and federal law.

118  Jason Jacobson conducted an improper interrogation of a minor through the use of the

119  Reid technique, with no parent present, through intimidation, threats, and coercion.

120  Jason Jacobson illegally detained the Plaintiff and confirms this fact on his

121  supplemental police report.

122  Jason Jacobson committed fraud by including lies, omissions, and fraudulent

123  information in his police reports. This also includes the use of false narratives of

124  guilt when there was no evidence supporting his claims. His police reports contradict

125  physical evidence which includes audio and video evidence.

126  Jason Jacobson was caught committing Perjury on the stand when questioned by the

127  Plaintiff during a court hearing where he was caught contradicting his own police

128  reports as well as the audio and video evidence further tainting Plaintiffs Due

129  Process.

130  Jason Jacobson actions and lack of proper investigation displayed obvious signs of

131  confirmation bias.

132  Jason Jacobson took possession of the Plaintiffs cell phone and accessed the cell

133  phone without a search warrant.

134  Jason Jacobson destroyed and tampered with evidence beneficial to criminal defense by

135  deleting records contained in the Plaintiffs brother's cellphone prior to 4/15/2015.

136  This was Jason Jacobson's attempt to cover up the Plaintiffs brother's emergency Cauda

137  Equina Surgery and subsequent recovery time that took place at the same time as

138  Jacobson reported the sexual misconduct was taking place making the allegation of

139  sexual misconduct medically and physically impossible. This evidence was later

140  provided to the prosecution by the Plaintiff but could have been simply discovered if

141  Jason Jacobson properly investigated the allegation to begin with, but instead Jason

142  Jacobson attempted to conceal the evidence proving the Plaintiff's innocence and at

143  the same creating prejudice tainting the Plaintiffs case.

144  Jason Jacobson did not follow protocol and improperly handled evidence between

145  government agencies.

146  Jason Jacobson further tampered with physical evidence by stripping and cutting

147  evidence obtained via and illegal search warrant.

148  Jason Jacobson accused with Plaintiff of possessing stolen firearms showing further

149  confirmation bias and prejudice, in reality, The Plaintiff's brother legally owned the

150  firearms, which have receipts, as well as the Plaintiff brother's Permit to Purchase

151  all provided to the Prosecution.

152  Jason Jacobson conspired with the prosecution and the B.C.A. to commit fraud and

153  manufactured false evidence used against the plaintiff in the form of scientific

154  testing which was never actually completed.

155  BCA requirement:

156  Marijuana cases will be accepted when the case information includes a written

157  statement from the prosecuting attorney indicating that the suspect has pled not

158  guilty or rejected a plea agreement and a trial has been scheduled.  The date of the

159  trial must be included.  Evidence must be received by the laboratory at least 10

160  business days prior to the trial date.

161  Jason Jacobson did not use a certified scale.

162  Jason Jacobson along with Bostyn Thompson drafted and executed an illegal search

163  warrant consisting of a forgery of the Redwood District Court Judge's signature

164  due to the fact that they would have been unable to obtain a search warrant otherwise

165  and that the search warrant itself was for a crime that Jason Jacobson manufactured

166  himself without any evidence whatsoever. The search warrant in itself was void of

167  probable cause, including a fraudulent affidavit containing lies and omissions as well

168  as defective in itself due to supreme court decision of US vs Hodson, 543 F.3d 286,

169  292.

170  Jason Jacobson used further intimidation on the Plaintiff and his brother by informing

171  the Plaintiffs brother's defense attorney that the Plaintiff and his brother must

appear in front of him at the Sheriffs department to "talk" after a fraudulent

"nationwide arrest warrant was issued and unsigned by a Judge for failure to appear.

Jason Jacobson informed the Plaintiffs defense attorney several times to not go to

the court as summoned, which the Plaintiff perceived as a threat of violence. Jacobson

then contacted and conspired with a law enforcement officer Kris Karlgaard (who

already has a history of misconduct) in Breckenridge Minnesota and had him

continuously threaten and intimidate the Plaintiffs grandmother on his behalf using a

fraudulent arrest warrant. More evidence of Jason Jacobson's misconduct and fraud,

includes conspiring with the prosecution and Bostyn Thompson to further manufacture

and fabricate evidence, this example is in the form of a computer disk labeled

"Sarah's confession 9/7/15". The disk contained no information, as the "confession

interview" with Sarah Daub never actually took place, as Sarah Daub can confirm. Jason

Jacobson along with Bostyn Thompson needed to create false evidence since there was no

real evidence of a crime having been committed by the Plaintiff brother to begin with,

so they did. This was done with the assistance of Assistant D.A. Kelly Meehan.

Jacobson would also use more fabricated evidence to create simple petty confirmation

bias's in the form of a legitimate medical prescription of Adderall and unused old

cell phones. Jacobson reported the Plaintiff's brother must have been selling the

pills illegally without any sort of proof nor actually bringing a criminal charge

against the Plaintiff's brother regarding this matter but instead used the information

to add to his already well documented misconduct and unethical pattern of behavior.

His pattern of behavior is further evident when he found old cell phones in a box

during the execution of his illegal search warrant.  Jacobson once again created a

false narrative in that the Plaintiff must be a drug dealer. These phones were

searched via Cellebrite Software without a warrant or probable cause and found to be,

in reality, simply old phones used more than 5 years ago by various family members of

the Plaintiff.

Jason Jacobson intentionally manufactured and fabricated new crimes against the

Plaintiff brother that were irrelevant and unrelated to his investigation once he

discovered that no sexual misconduct took place. This includes an irrational and

extraordinarily malicious and disgusting accusation that the Plaintiff's brother must

be in possession of child pornography in which Jacobson along with Bostyn Thompson

used to fabricate their search warrant. Of course, no child porn existed nor was there

any suspicion or evidence other than what Jacobson manufactured in his own mind. This

in itself created an immeasurable amount of bias and taint against the Plaintiff's

right to a fair trial and hearings, as well as difficulty searching for fair representation due to the vile nature of such an allegation. Bostyn Thompson was completely aware of his actions and the misconduct of Jacobson for he stated on the stand during a court hearing that "no evidence of child porn existed nor was it ever suspected" and "assumed Jacobson knew what he was doing since he wrote "hundreds of search warrants".

After the Plaintiff's arrest, Jason Jacobson was seen by neighbors who witnessed and will testify that Jacobson returned to the house in which he assisted in searching the previous day without a warrant. He was seen re-entering the premises through the front door without a warrant while the Plaintiff was being held in jail.

Jason Jacobson intentionally did not include dates or times on any audio and video evidence he obtained during his initial investigation as to conspire with the prosecution in changing the time and date of events in order to correspond with their ever-changing false narrative. Further showing of failure to follow police procedure. Jason Jacobson intentionally used unreliable hearsay from Miya Thompson who is the reporting party to law enforcement, not Douglas Daub as stated on the fraudulent police reports and probable cause documents and criminal complaint as verified by video and audio evidence and interviews with Douglas Daub and Miya Thompson. This was obviously done in a poor attempt to obtain credibility of the reported allegation since Miya Thompson is an unreliable hearsay witness. Miya Thompson had claimed she was a meth addict who escaped from a rehab facility and who had been abused in the past by an older male in which she was in a physical relationship with. Miya Thompson claimed that the Plaintiff's brother was in the same kind of relationship with a minor. This was quickly disproven via audio and video interviews of witnesses. Jason Jacobson didn't care because it did not fit with his false narratives of the investigation. Jason Jacobson used the false information provided by Miya Thompson and intentionally mislead and intimated Douglas Daub (the father of the minor accused of misconduct with the Plaintiff's brother) and conspired with the prosecution in order to obtain a fraudulent Ex Parte order claiming there was abuse and violence. Jason Jacobson then withheld the evidence for four months (withheld in order to fraudulently obtain the ex parta) in the form of a letter written by hand by the accused minor which clearly states information that contradicts the Ex Parta order and was beneficial to the innocence of Plaintiff and a clear example of how Jason Jacobson continued behavior of misconduct and fraud. The Ex Parta would have never been issued

241 if the facts were correct and not fabricated and the simple fact that the Plaintiff

242 was in no way involved to begin with.

243 Jason Jacobson then continued his investigation of alleged sexual misconduct even

244 after charges where already brought and filed once he and the prosecution became aware

245 that the Plaintiff was accusing them of misconduct. The Plaintiff finds the actions of

246 Jason Jacobson's during his continued investigation of the crimes interesting, since

247 at the time the charges are filed the investigation should have already concluded.

248 Jason Jacobson has a conflict of interest. Jason Jacobson is on the board for New

249 Horizons Center in which he conspired with the prosecution team and this organization

250 to have the accused minor forcibly removed from her home and sent to New Horizons

251 Center which then under detention and further intimidations and threats elicited a

252 false confessions more than four months after the arrest and charges brought against

253 the Plaintiff in order to cover-up the manufactured confession evidence in which he

254 conspired with the prosecution and fellow law enforcement to create.

255 Jason Jacobson extracted passwords from the Plaintiffs cell phone via Cellebrite

256 System and without a warrant viewed and kept surveillance on the Plaintiffs emails

257 after the arrest was made.

258 Jacobson's obvious lack of intelligence does not justify his repeated pattern of

259 misconduct and unethical behavior, nor does his idiocrasy justify his complete

260 disregard of the law.

261 Jason Jacobson clearly suffers from some kind of undiagnosed mental illness that

262 consists of paranoia and delusion. Jason Jacobson's bias against the Plaintiff, in

263 which Jason Jacobson clearly believed was guilty of everything and anything which

264 manifested inside his own mind contrary to the any facts proven to exist in reality.

265 Further examples of Jason Jacobson's misconduct and crimes will be provided by the

266 Plaintiff during trial as to not allow the involved parties to further tamper and

267 destroy evidence.

268 **Chief Bostyn Thompson and the City of Morgan Police Department on or around**

269 **September 1st of 2015 are liable for the misconduct of their employees whom engaged in**

270 **a pattern and practice of unlawful conduct depriving the Plaintiff of his Rights**

271 **protected under the Constitution of the United States.**

272 Bostyn Thompson conspired with Jason Jacobson of the Redwood County Sheriff's

273 Department and the prosecution team to intentionally draft, file and execute an

274 illegal search warrant for child pornography at the Plaintiff's residence,

275 unrelated to the Plaintiff in any way, nor did it contain any mention of the

276 Plaintiff.

277 Bostyn Thompson intentionally did not report the misconduct and unethical behavior of

278 fellow law enforcement officers as required by law.

279 Bostyn Thompson was awarded a brand-new police cruiser in the city of Morgan by the

280 Redwood County Sheriff's Department for his actions and cooperation in the misconduct

281 and crimes of fellow law enforcement of the Redwood County Sheriff's Department.

282 Bostyn Thompson wrote fraudulent police reports containing lies and omissions in which

283 he conspired with Jason Jacobson, Mitch Zimmerman, Mike Hubin and Mike Campbell of the

284 Redwood County Sheriff's Department.

285 Bostyn Thompson conducted an improper interrogation of a minor.

286 Bostyn Thompson conspired with Jason Jacobson and the prosecution team with direct

287 assistance from Kelly Meehan to manufacture and fabricate evidence in the form of a

288 "confession".

289 Bostyn Thompson failed to properly investigate an allegation of sexual misconduct.

290 Bostyn Thompson intentionally stated in his police reports during his investigation

291 that he attempted to contact the Plaintiff's brother but was unable to do so as he

292 states the plaintiff's brother was "refusing to speak with him and intentionally left

293 town to hide".

294 Bostyn Thompson did this in a fraudulent attempt to create bias. Whereas in reality,

295 the Plaintiff's brother was simply out of town and took it upon himself to contact the

296 Morgan Police Department via a phone call the same day Bostyn Thompson attempted to

297 contact the Plaintiff's brother in person. The Plaintiff's brother informed the Morgan

298 Police Department that he was aware Bostyn Thompson wanted to speak with him and that

299 he was out of town with family but is concerned and will immediately drive back to

300 town around 8am the following day. Bostyn Thompson, instead of simply speaking to the

301 Plaintiff's brother the following day, used his cooperation as a means of

302 securing his detainment at 8am during an illegal search and seizure without first

303 interviewing the Plaintiff about the allegations made against his brother by

304 Miya Thompson (the reporting party) as standard procedure dictates. The Plaintiff

305 finds it suspicious that Miya Thompson (the reporting party) can report an allegation

306 of sexual misconduct that she believes took place without evidence or proof and that

307 law enforcement intentionally did not conduct a proper investigation. The fact is that

308 the minor she accused of being involved in the allegation of sexual misconduct with,

309 the Plaintiff's brother, herself denied the allegation on more than three occasions to

310    law enforcement and informed law enforcement that Miya Thompson (the reporting party)

311    was simply angry and retaliating against the Plaintiff's brother. The Plaintiff's

312    brother made a statement to the minor that he believed Miya Thompson (the reporting

313    party) to be a "bad influence" given her history of drug abuse and skipping school.

314    The fact is that law enforcement didn't bother to interview the Plaintiff or his

315    brother about the allegation that Miya Thompson (the reporting party) made or at least

316    give the Plaintiff's brother an opportunity to defend himself from some angry child is

317    appalling. The fact is that law enforcement found no evidence of sexual misconduct and

318    then decided that the Plaintiff's brother is now guilty of possession of child

319    pornography. The misconduct displayed by Bostyn Thompson and law enforcement truly

320    "shocks the conscious".

321    Bostyn Thompson failed to properly follow police procedure during a criminal

322    investigation.

323    Bostyn Thompson confessed via testimony in court that "Jason Jacobson of the Redwood

324    County Sheriff's Department instructed him on drafting and executing the search

325    warrant" in which he also confessed "he had never written one before" and "aware that

326    the search warrant was written for a sexual misconduct allegation and is in no way

327    related to child pornography nor did he have any evidence or allegations of child

328    pornography". He also stated on the stand that "he is aware that sexual misconduct and

329    child pornography are completely different and unrelated offenses".

330    Bostyn Thompson intentionally executed an illegal search warrant along with Jason

331    Jacobson, Mike Hubin and Mike Campbell of the Redwood County Sheriff's Department.

332    Bostyn Thompson committed further misconduct by omitting during his investigation that

333    he has already met and was acquainted with the Plaintiff's brother, aware that the

334    Plaintiff's brother did not live in Morgan, MN and already had all of the Plaintiff's

335    contact information. Contrary to the fraudulent information contained in the police

336    reports written by all law enforcement officers involved in the investigation of

337    alleged sexual misconduct. This information also contradicts the affidavit of the

338    initial search warrant and statements of probable cause. Approximately five months

339    prior to the criminal investigation against the Plaintiff's brother, the Plaintiff's

340    brother was acting as a Good Samaritan in Morgan, MN by assisting Bostyn Thompson

341    during a vulnerable adult issue. The vulnerable adult was the Plaintiffs neighbor and

342    the Plaintiff's brother was concerned about her wellbeing. Bostyn Thompson invited the

343    Plaintiff's brother to ride along with himself and the vulnerable adult to the Redwood

344    Falls Hospital in order to help keep the vulnerable adult calm. The Plaintiff's

345  brother agreed. After the vulnerable adult was safely brought to the Redwood Falls

346  Hospital, Bostyn Thompson offered to bring the Plaintiff's brother back to the

347  Plaintiff's residence in Morgan, MN. During the drive the Plaintiff's brother and

348  Bostyn Thompson discussed their similar interests in music, as Bostyn Thompson plays

349  the guitar etc.

350  Bostyn Thompson then asked the Plaintiff's brother questions and statements for his

351  police report in which the Plaintiff's brother informed Bostyn Thompson that he was

352  working as a freelance investigative journalist, that he is new to the area and is

353  temporarily staying with his brother to focus on his writing. Plaintiff's brother

354  informed Bostyn Thompson that he lives in St. Louis Park, MN as stated on his State

355  Driver's License ID that he provided for Bostyn Thompson as well as his phone number,

356  things required for Bostyn Thompson's police report. All law enforcement personal

357  ignored this information as did the prosecution team and refused to allow Bostyn

358  Thompson's police report of this incident be acknowledged in court as the information

359  was beneficial to the Plaintiff and provided more adequate evidence of law

360  enforcement's repeated pattern of behavior that is misconduct and fraud which results

361  in depriving the Plaintiff of his Civil and Constitutional rights.

362  **Mitch Zimmerman of the Redwood County Sheriff's Department on or around September**

363  **1st of 2015 committed misconduct and intentionally deprived the Plaintiff of his Civil**

364  **and Constitutional Rights Under Color of Law.**

365  Mitch Zimmerman intentionally conspired with Jason Jacobson, Bostyn Thompson, Mike

366  Campbell and Mike Hubin to falsify police reports.

367  Mitch Zimmerman did not follow police procedure and failed to properly investigate an

368  allegation against the Plaintiff's brother.

369  Mitch Zimmerman and Mike Campbell were caught on audio during an interview with Miya

370  Thompson (the reporting party) intentionally and recklessly obtaining unreliable

371  hearsay evidence from multiple unreliable witnesses as well as being heard discussing

372  and conspiring on how to deprive the plaintiff's brother of his 4th amendment right to

373  privacy under the color of law.

374  Mitch Zimmerman intentionally did not report the misconduct and unethical behavior of

375  fellow law enforcement officers as required by law.

376  Mitch Zimmerman intentionally and recklessly along with Mike Campbell improperly

377  interrogated a minor with use of intimidation, threats and coercion.

378  **Mike Campbell of the Redwood County Sheriff's Department on or around September**

379  **1st of 2015 committed misconduct and intentionally deprived the Plaintiff of his Civil**

380 and Constitutional Rights Under Color of Law.

381 Mike Campbell intentionally conspired with Jason Jacobson, Bostyn Thompson, Mitch

382 Zimmerman and Mike Hubin to falsify police reports.

383 Mike Campbell did not follow police procedure and failed to properly investigate an

384 allegation against the Plaintiff's brother.

385 Mike Campbell intentionally did not report the misconduct and unethical behavior of

386 fellow law enforcement officers as required by law.

387 Mike Campbell intentionally and recklessly along with Mitch Zimmerman improperly

388 interrogated a minor with use of intimidation, threats and coercion.

389 **Mike Hubin of the Redwood County Sheriff's Department on or around September 1st**

390 **of 2015 committed misconduct and intentionally deprived the Plaintiff of his Civil and**

391 **Constitutional Rights Under Color of Law.**

392 Mike Hubin intentionally conspired with Jason Jacobson, Bostyn Thompson, Mitch

393 Zimmerman and Mike Campbell to falsify police reports.

394 Mike Hubin did not follow police procedure and failed to properly investigate an

395 allegation against the Plaintiff's brother.

396 Mike Hubin intentionally did not report the misconduct and unethical behavior of

397 fellow law enforcement officers as required by law.

398 Mike Hubin assisted Jason Jacobson in illegally detaining the Plaintiff.

399 Mike Hubin intentionally and recklessly assisted Jason Jacobson and Bostyn Thompson in

400 executing an illegal search warrant on the Plaintiff.

401 **Sheriff Randy Hanson, Chief Deputy Mark Farasyn and the Redwood County**

402 **Sheriff's Department on or around September 1st of 2015 are liable for the misconduct**

403 **of their employees whom engaged in a pattern and practice of unlawful conduct**

404 **depriving the Plaintiff of his Rights protected under the Constitution of the United**

405 **States.**

406 This pattern of misconduct and inadequacy of operations led to the involvement of

407 other law enforcement employees such as Deputy Jason Jacobson, Deputy Mike Campbell,

408 Deputy Mitch Zimmerman, and Deputy Mike Hubin, who therefor violated federal law by

409 entering false information of a report, which then sought a Warrant, although there

410 are multiple defects in the Warrant; for example, a Brady Defect in the Warrant due to

411 Exculpatory Brady Material being withheld by the Prosecution Team. This in turn led to

412 Deputy Jason Jacobson and Chief of Police Bostyn Thompson to violate their oaths while

413 procuring and obtaining a defective search warrant which was based in its entirety on

414 multiple levels of 3rd party hearsay against Plaintiff's brother and void for failure

415  to provide any form of Due Process, leading to the unlawful detainment of Plaintiff.

416  Upon procuring a second search warrant, Plaintiff was unlawfully arrested for 5th

417  Degree Possession. After spending 52 hours in the Redwood County Jail without being

418  charged with a crime, without any kind of medical care, without having a first

419  appearance in front of a Judge and not allowed access to representation all well

420  beyond the 48 Hour Rule by use of an unlawful ex-parte order against the Plaintiff

421  drafted by prosecutor Kelly Meehan and Deputy Jason Jacobson, numerous other charges

422  were then brought against Plaintiff. Upon arrest, the investigation shall cease,

423  though it did not by means of manufacturing evidence of a confession disk. Due to

424  the use of a false police narrative as well as the misconduct of law enforcement bias

425  tainted the Judge's ruling of bail restrictions placed on the Plaintiff which ordered

426  him to stay 250 feet away from his brother with no probable cause.

427  The Redwood County Sheriff's Department also concealed and suppressed from the Court

428  the use of jail house informants as well using minors with histories of drug abuse,

429  since only evidence beneficial to the Plaintiff and the Plaintiff's brother was

430  discovered and NOT evidence supporting the Sheriff Department's crooked practices.

431  Obviously these two individuals will attempt to divert the blame and target the low-

432  lying fruit, by targeting the deputies. Although the facts are simple, the failures of

433  both Sheriff Randy Hanson and Chief Deputy Mark Farasyn were caused by incompetence

434  and negligence. They failed to over-see their own operations and uphold their oaths

435  and duties, therefor depriving the Plaintiff of his Civil and Constitutional Rights.

436  **Assistant District Attorney Kelly Meehan and lead prosecutor on or around**

437  **September 1st of 2015 intentionally conspired with the Redwood County Sheriff's**

438  **Department, City of Morgan Police Department, Judge Patrick Rohland, District Attorney**

439  **Steven Collins, Assistant District Attorney Jenna Peterson-Haler, Public Defender**

440  **Erica Allex and Public Defender Joel Solie to deprive the Plaintiff of his Civil and**

441  **Constitutional rights by committing misconduct and fraud so egregious that it "shocks**

442  **the conscious".**

443  Kelly Meehan intentionally did not report the misconduct, crimes and unethical

444  behavior of law enforcement as required by federal law.

445  Kelly Meehan intentionally made the Plaintiff guilty until proven innocent.

446  Prosecutors commit misconduct when in the course of their professional duties they act

447  in ways that are inconsistent with ethical mandates they are obliged to obey. Such

448  misconduct exists at and near the intersection of two sets of rules: one is the legal

449  rules that bind prosecutors so as to ensure due process – the state and federal

450 constitution, statutory law, rules of criminal procedure, judicial orders, and the

451 like. The other is the ethical standards of the legal profession as expressed in each

452 state bar's rules of professional responsibility and similar professional codes.

453 Often an act of prosecutorial misconduct will violate both legal and professional

454 codes. Though, because the codes differ in some ways, sometimes an act of misconduct

455 may violate one code but not the other. Prosecutors are required to abide by both.

456 Kelly Meehan intentionally did not report the misconduct and unethical behavior of law

457 enforcement as required by federal law.

458 Kelly Meehan intentionally conspired with Bostyn Thompson and Jason Jacobson to draft

459 an illegal and defective search warrant.

460 Kelly Meehan intentionally conspired with Bostyn Thompson and Jason Jacobson to

461 manufacture, fabricate and introduce false evidence in the form of an empty disk

462 labelled "Sarah Confession".

463 Kelly Meehan intentionally used false evidence in the form of fraudulent police

464 reports in order to prosecute the Plaintiff.

465 Kelly Meehan intentionally used an illegal joinder of charges to create bias against

466 the Plaintiff's brother, therefor against the Plaintiff as well.

467 Kelly Meehan committed misconduct by maliciously prosecuting the Plaintiff.

468 Kelly Meehan intentionally violated the ABA Rules of Professional Conduct and Ethics.

469 Kelly Meehan intentionally mislead the court by displaying fabricated circumstantial

470 evidence as fact.

471 Kelly Meehan assisted the Redwood County Sheriff's Department in maliciously

472 continuing an investigation against the Plaintiff after the arrest was already made.

473 Kelly Meehan committed further prosecutorial misconduct by improper communications

474 with the Judge. During court hearings Kelly Meehan stated to Judge Rohland that "we

475 have a serious issue here we need to discuss in private your honor" occurred when the

476 Plaintiff requested a Franks hearing. Kelly Meehan and Judge Rohland would then

477 repeatedly stop all proceedings and conspire in private to deprive the Plaintiff of

478 said hearing in order to cover-up prosecutorial and law enforcement misconduct. Kelly

479 Meehan made extra judicial comments during court hearings defaming the character of

480 the Plaintiff in order to create a confirmation bias as well as using confidential

481 sealed juvenile records to create bias and prejudice.

482 Kelly Meehan stated to the Judge during a bail hearing that the Plaintiff was a

483 criminal and that he "not be allowed contact with his brother or any family members

484 who are likely also criminals" without any proof in an attempt to convince the Judge

485  to not allow the Plaintiff to be released from Jail. Of course, the Judge disagreed

486  about the Plaintiffs parents but not his brother, which further supports her and the

487  Judge's confirmation bias and unethical behavior while in court. Naturally, the

488  Plaintiff was not allowed representation at this time violating his rights.

489  Kelly Meehan brought charges against the Plaintiff that were overreaching and lacking

490  probable cause. Kelly Meehan charged the Plaintiff with "committing a crime while

491  wearing a bulletproof vest", when in reality the Plaintiff's brother has a "go-bag"

492  recommended by both FEMA and the US Government in case of emergencies, in which a

493  bulletproof vest was included along with other gear. Owning a bulletproof vest is not

494  illegal nor was the Plaintiff or the Plaintiff's brother wearing it the day of his

495  arrest.

496  The Plaintiff was charged by Kelly Meehan without probable cause, possession of a

497  firearm without a permit to carry.

498  Kelly Meehan charged the Plaintiff with more offenses then were warranted.

499  Kelly Meehan intentionally charged the Plaintiff multiple times with the same crime.

500  Kelly Meehan would repeatedly display unprofessional and unethical pattern of behavior

501  throwing temper tantrums during court hearings when the Plaintiff would exercise his

502  rights instead of "simply accepting a plea deal like everyone else."

503  Kelly Meehan repeatedly used a false narrative to make up for lack of any physical

504  evidence against the Plaintiff.

505  Kelly Meehan conspired with both Erica Allex and Joel Solie to listen in on all

506  private conversations between the Plaintiff and his Public Defenders.

507  Kelly Meehan intentionally interfered with the Plaintiff's right to representation and

508  instructed both public defenders to lie to the Plaintiff by pretending that a "Franks

509  Hearing" doesn't exist in Minnesota when the Plaintiff informed his Public defenders

510  his intention to challenge the affidavit of the initial search warrant. Joel Solie

511  admitted to the Plaintiff that "Meehan will never allow us to challenge the initial

512  Search Warrant" which is in the Plaintiffs right to do so. Kelly Meehan was

513  intentionally covering-up her misconduct and the misconduct of law enforcement.

514  Kelly Meehan failed to disclose exculpatory evidence showing proof of the Plaintiff's

515  innocence on multiple occasions.

516  Kelly Meehan repeatedly filed motions of continuances further violating the

517  Plaintiff's right to a fair and speedy trial.

518  Kelly Meehan intentionally deprived the Plaintiff of Due Process in an attempt to

519  conceal misconduct.

520  Kelly Meehan conspired with the Redwood County Sheriff's Department in order to
521  falsify police records to state and create a false narrative, which is that the minor
522  who was accused of sexual misconduct (Sarah Daub) with the plaintiff's brother as well
523  as her father are the reporting party. When the facts based in reality prove via audio
524  and video evidence is false. Kelly Meehan conspired with Jason Jacobson to use the
525  fraudulent police reports to create a bias and false narrative against the Plaintiff
526  as a means to fabricate a fraudulent Ex Parta order of domestic violence in order for
527  the minor to not be allowed on the stand to testify on behalf of the Plaintiff because
528  it would be detrimental to the prosecution's false narrative. Kelly Meehan then
529  retaliated against the minor by removing her from her home and family by placing her
530  into New Horizon's Center in which the prosecution then informed the Plaintiff that
531  she cannot be called as a witness further violating the Plaintiff's rights. The minor
532  clearly stated during interrogation on video previously that "nothing happened, how
533  can you bring charges against him?" and while imprisoned at New Horizons Center told
534  the staff and Jason Jacobson repeatedly that she will not go on the stand for them and
535  lie".
536  When the Plaintiff discovered the prosecutorial misconduct and deprivation of rights
537  against him, he informed his Public Defender that he will pursue civil action against
538  Kelly Meehan. Erica Allex then informed Kelly Meehan and Judge Rohland of what the
539  Plaintiff had told her on confidence. Kelly Meehan immediately displayed her cowardice
540  and resigned as prosecutor due to her misconduct and crimes the Plaintiff discovered.
541  Kelly Meehan then hid under the protection of the Attorney General Lori Swanson's
542  Office further displaying her guilt of the crimes against the Plaintiff.
543  The Plaintiff then sent a Declaration of Public Corruption to the Attorney General's
544  Office regarding the corruption and misconduct of public officials and law enforcement
545  in Redwood County Minnesota. Lori Swanson did not respond nor investigate as required
546  under federal law in relation to public corruption allegations further damaging the
547  integrity of the U.S. Justice System. The Plaintiff then sent documents to Senator Amy
548  Klobuchar's office informing the Senator of the Plaintiffs situation and lack of legal
549  relief. The office responded to the Plaintiff that "we are sorry to hear of the
550  difficulties you are experiencing" and "Amy Klobuchar and her office would like to be
551  of assistance in this matter, but as a United States Senate office, we are limited
552  under law to contacting federal agencies only on behalf of Minnesota constituents and
553  do have jurisdiction to assist you directly in this matter. The US Constitution
554  strictly limits intrusion of one branch of government upon another" and "we sincerely

regret that we cannot be assistance to you in this matter." The Plaintiff has clearly

demonstrated his attempts to obtain legal relief in this matter and hold Keely Meehan

responsible for her crimes and pattern of behavior.

**Assistant District Attorney Jenna Peterson-Haler on or around September 1st of**

**2015 intentionally conspired with the Redwood County Sheriff's Department, City of**

**Morgan Police Department, Judge Patrick Rohland, District Attorney Steven Collins,**

**Assistant District Attorney Kelly Meehan, Defense Attorney Megan Burkhammer, Defense**

**Attorney Paul Hunt, Defense Attorney Eric Olson, Defense Attorney Ryan Garry to**

**deprive the Plaintiff of his Civil and Constitutional rights by committing misconduct**

**and fraud so egregious that it "shocks the conscious".**

Jenna Haler-Peterson took over the position of lead prosecutor upon the resignation of

Kelly Meehan and intentionally continued the Malicious Prosecution against the

Plaintiff. Jenna Peterson-Haler then intentionally continued a pattern of misconduct

and unethical behavior in order to cover-up the misconduct and crimes committed by the

prosecution and law enforcement depriving the Plaintiff of his Civil and

Constitutional Rights. All misconduct committed by the prosecution previous to Jenna

Peterson-Haler taking over as lead prosecutor are still relevant as she was aware and

continued the malicious prosecution anyway.

Jenna Peterson-Haler intentionally did not report the misconduct and unethical

behavior of law enforcement as required by federal law.

Jenna Peterson-Haler intentionally did not report the misconduct, crimes and unethical

behavior of law enforcement as well as not reporting the misconduct and crimes of the

malicious prosecution of Kelly Meehan as required by federal law.

Jenna Peterson-Haler violated the ABA guideline of professional and ethical behavior.

Jenna Peterson-Haler deprived the Plaintiff's right to face his accuser.

Jenna Peterson-Haler repeatedly filed motions of continuances further violating the

Plaintiff's right to a fair and speedy trial. This assisted her in drafting motions

using courts cases from 2016 and 2017 when the allegations and charges are dated

September of 2015.

Jenna Peterson-Haler conspired with Jason Jacobson and the New Horizons Center to

ensure the minor accused of sexual misconduct was not allowed to testify on the stand

because it would benefit the Plaintiff.

Jenna Peterson-Haler intentionally interfered with the Plaintiff's right to

representation because confidential emails between the Plaintiff and his

representation was forwarded and her email copied on correspondences with his defense

590 attorney. This is easily proven with the fact Jenna Peterson-Haler, Eric Olson,

591 Megan Burkehammer, Paul Hunt and Ryan Garry didn't realize that forwarded messages and

592 recipients copied to an email are shown and hidden in the meta-data of an email.

593 Jenna Peterson-Haler would refer to court cases from 2016 and 2017 in her motion

594 briefs when the allegations took place in 2015.

595 When the Plaintiff demanded that all civil and constitutional right violations are to

596 be addressed prior to a plea hearing Jenna Peterson-Haler showing her true colors

597 intimidated the Plaintiff by sending letters via US Mail from the Redwood County

598 Courthouse threatening to deliberately fabricate evidence she would claim was found on

599 the Plaintiff's cell phone. These letters Jenna Peterson-Haler sent have been saved

600 and documented as further proof of her pattern of behavior.

601 The Plaintiff sent information and complaints documenting Jenna Peterson-Haler's

602 misconduct and crimes to the Lawyers Committee of Professional Conduct, the Attorney

603 General's Office of Lori Swanson and to Minnesota Senator Amy Klobuchar. Jenna

604 Peterson-Haler then followed in the footsteps of District Attorney Steven Collins and

605 Assistant District Attorney Kelly Meehan, knowing she had been caught, decided to

606 resign from her position abandoning the prosecution against the Plaintiff. The Redwood

607 County Board accepted her resignation. Then two weeks after her resignation, members

608 of the Redwood County Board and the City of Redwood Falls, MN (thoroughly documented

609 in city and county council meetings) gathered again and made the decision that Jenna

610 Peterson-Haler cannot resign since both District Attorney Steven Collins and Assistant

611 District Attorney did so before her due to their actions. Once again, the Plaintiff

612 was unable to obtain the necessary relief.

613 **District Attorney Steven Collins and the Redwood County District Attorney's Office**

614 **or around September 1st of 2015 are liable for the misconduct of their employees whom**

615 **engaged in a pattern and practice of unlawful conduct depriving the Plaintiff of his**

616 **Rights protected under the Constitution of the United States.**

617 District Attorney Steven Collins of The Redwood County District Attorney's Office is

618 an elected public official whom intentionally conspired with his staff along with

619 members of the Redwood County Public Defender's Office, members of the Redwood County

620 Sheriff's Department, members within the Redwood County District Court to Deprive the

621 Plaintiff of his Civil and Constitutional Rights. The District Attorney Steven Collins

622 conspired with Judge Patrick Rohland to have the prosecution team "under any

623 circumstances necessary", force the Plaintiff to appear at a Plea Hearing and accept a

624 Plea Deal without addressing the Civil and Constitution right violations addressed, as

625 to obtain civil immunity. Appearing at a Plea Hearing would also void the Plaintiff's
626 right to have any civil and constitutional right issues addressed in court for the
627 reminder of the case proceedings, only during appeals would the Plaintiff be able to
628 address civil and constitutional right violations. Judge Patrick Rohland let it be
629 known to the Plaintiff's representation in the court room that "We must make sure this
630 doesn't go to appeals".

631 The District Attorney Steven Collins, although accepting his guilt by resigning, shall
632 be held liable for the pattern of misconduct and unethical behavior that he himself
633 displayed, but for also the conduct and actions of his employees. The Redwood County
634 District Attorney's Office as well as District Attorney Steven Collins intentionally
635 continued a malicious prosecution against the Plaintiff as an attempt to cover-up the
636 misconduct and crimes committed by those within their agency. District Attorney Steven
637 Collins failed to report the misconduct and crimes as required by both state and
638 federal law. District Attorney Steven Collins failed to uphold his oath office and in
639 turn damaged the integrity of the United States Criminal Justice System. This pattern
640 of misconduct and inadequacy of operations lead to the involvement of multiple
641 government agencies. District Attorney Steven Collins and the Redwood County District
642 Attorney's Office failed to over-see their own operations due to incompetence and
643 negligence.

644 District Attorney Steven Collins failed to uphold his oaths and duties in Office,
645 therefor depriving the Plaintiff of his Civil and Constitutional Rights. The actions
646 of District Attorney Steven Collins and the Redwood County District Attorney's Office
647 led the Plaintiff to further seek relief by sending written complaints to the Lawyers
648 Board of Professional Conduct, Office of Lawyers Professional Responsibility, Attorney
649 General Lori Swanson, Minnesota State Senator Amy Klobuchar, the Minnesota Division of
650 the Federal Bureau of Investigation, Director of The Federal Bureau of Investigation
651 Christopher Way and C/O Federal Bureau of Investigation Headquarters in Washington DC
652 Civil Rights Division and Minnesota Governor Mark Dayton's Office.

653 **Types of Prosecutorial Misconduct Unethical Behavior Relevant to the Plaintiff's**
654 **Allegations of Misconduct and Deprivation of Rights.**

655 Below is a list of some common types of prosecutorial misconduct. Prosecutorial
656 misconduct comes in many forms, and this list is not meant to be exhaustive, nor is it
657 designed to preclude other ways of describing and classifying misconduct.

658 **Failure to disclose exculpatory evidence:**

659 In Brady v. Maryland and a line of subsequent cases, the U.S. Supreme Court has held

that the U.S. Constitution requires that prosecutors turn over to the defense evidence that tends to show the defendant is not guilty or deserves a lesser punishment. The failure to disclose "Brady material" is one common form of prosecutorial misconduct. This behavior also frequently violates professional rules which prohibit lawyers from disobeying obligations, obstructing access to evidence, and failing to comply with discovery, as well as professional rules which require prosecutors to make timely disclosure of all information that tends to negate guilt or mitigate punishment. (See, e.g., ABA Model Rules 3.4, 3.8, and 8.4)

**Introduction of false evidence**

In several cases including Napue v. Illinois, the U.S. Supreme Court has held that the U.S. Constitution prohibits prosecutors from introducing false evidence, including false testimony, and requires prosecutors to correct falsehoods. Such behavior may also violate professional rules which prohibit attorneys from offering evidence the lawyer knows to be false, assisting or inducing a witness to testify falsely, or eliciting false testimony without taking measures to correct it. (See, e.g., ABA Model Rules 3.3, 3.4, and 8.4) Because misconduct involving false evidence also frequently involves the failure to disclose (see above), you might find our page about Brady helpful.

**Improper argument**

In opening and closing statements at trial or statements made during pre-trial (and other similar circumstances), a prosecutor's use of certain types of prohibited modes of argument may constitute prosecutorial misconduct. For example, a prosecutor may not: assert facts not in evidence, misstate the law, vouch for the credibility of a witness, mischaracterize evidence, criticize the defendant for exercising his constitutional right not to testify, or engage in other similar prohibited behavior. This type of misconduct may violate federal and state constitutions as well as professional rules which prohibit these types of arguments. (See, e.g., ABA Model Rules 3.3 and 3.4)

**Interference with a defendant's right to representation**

Though they have positions of authority, prosecutors are not neutral, they are participants in adversarial proceedings against criminal defendants. Prosecutors also are also sophisticated, repeat players in a criminal justice system that may be foreign, confusing and terrifying to defendants. Prosecutors may not discourage defendants from obtaining counsel, nor may prosecutors take advantage of a defendant who has not yet had the opportunity to avail himself of counsel. If a prosecutor knows

695  that a defendant is represented, the prosecutor may not speak to a defendant about his

696  case without the defendant's attorney present. (See, e.g., ABA Model Rules 3.8(b),

697  3.8(c), 4.2 and 4.3)

698  **Improper communications with a judge or juror**

699  Rules restrict the types of interactions that all attorneys, including prosecutors,

700  may have with a judge or juror. For example there are rules which regulate ex parte

701  communication with judges – that is, an attorney communication with a judge where the

702  opposing counsel is not present. Similarly, during trial, it is generally improper for

703  a prosecutor or any attorney to communicate with jurors in any manner other than

704  before the judge, on the record. Furthermore, it is unethical and illegal for a

705  prosecutor or any attorney to attempt to influence a judge or juror with improper

706  inducements. (See, e.g., ABA Model Rules 3.5 and 8.4)

707  **Failure to train subordinates and maintain systems of compliance**

708  Prosecutors who have managerial responsibilities in district attorneys' offices have a

709  professional obligation to create systems in those offices that ensure that all lawyer

710  and nonlawyer professionals are aware of and comply with rules of professional

711  conduct. Prosecutors who supervise subordinates may not encourage or ratify misconduct

712  by subordinates and must make reasonable efforts to ensure that subordinates abide by

713  ethical rules. (See, e.g., ABA Model Rules 5.1, 5.3 and 8.4(a))

714  **Failure to report a violation of the rules of professional responsibility**

715  In many states, professional rules require that members of the bar inform the

716  appropriate authorities if they become aware that another attorney has committed a

717  serious violation of those professional rules. When prosecutors witness or learn of

718  misconduct and fail to report it, in certain instances, they too may be guilty of

719  misconduct. (See, e.g. ABA Model Rules 3.8)

720  Contact between individuals and the police, such as an arrest, search, or

721  interrogation, are discrete events; therefore, any violation of the defendant's rights

722  under the Fourth or Fifth Amendments will usually arise directly from that contact. A

723  prosecutor, on the other hand, deals with a defendant, and more importantly, the

724  defendant's attorney, on a routine basis throughout a criminal proceeding. There are,

725  at least quantitatively, a greater number of constitutional rights associated with the

726  adjudicative phase of a criminal proceeding than with the investigative phase, and the

727  parameters within which a violation can take place are much broader. Moreover, a

728  constitutional violation by the prosecutor can occur without any direct contact with

729  the defendant or his counsel, and it may be the culmination of a series of events

730  rather than the product of a discrete act. The motives and intent of police officers

731  are irrelevant to the Fourth Amendment issue of whether probable cause supported a

732  search or seizure.4 The Supreme Court, however, refers with some regularity to the

733  prosecutor's intent as one factor in determining whether prosecutorial misconduct

734  violated a defendant's rights. Unlike other areas of criminal procedure, in which the

735  Court focuses on the defendant's knowledge of a right and expectation of privacy, the

736  intent of the government's lawyer—the prosecutor—is often considered in determining

737  whether there was a constitutional violation arising from prosecutorial misconduct.

738  Prosecutor misconduct can assume many forms, including: (Innocence Project, Government

739  Misconduct, http://www.innocenceproject.org/understand/GovernmentMisconduct.php)

740  (last visited Sept. 5, 2013).

741  • Charging a suspect with more offenses than is warranted

742  • Withholding or delaying the release of exculpatory evidence

743  • Deliberately mishandling, mistreating, or destroying evidence

744  • Allowing witnesses, they know or should know are not truthful to testify

745  • Pressuring defense witnesses not to testify

746  • Relying on fraudulent forensic experts

747  • During plea negotiations, overstating the strength of the evidence

748  • Making statements to the media that are designed to arouse public indignation

749  • Making improper or misleading statements to the jury

750  • Failing to report prosecutor misconduct when it is discovered

751  **ABA Rule 3.8: Special Responsibilities of a Prosecutor**

752  The prosecutor in a criminal case shall: (a) refrain from prosecuting a charge that

753  the prosecutor knows is not supported by probable cause; (b) make reasonable efforts

754  to assure that the accused has been advised of the right to, and the procedure for

755  obtaining, counsel and has been given reasonable opportunity to obtain counsel; (c)

756  not seek to obtain from an unrepresented accused a waiver of important pretrial

757  rights, such as the right to a preliminary hearing; (d) make timely disclosure to the

758  defense of all evidence or information known to the prosecutor that tends to negate

759  the guilt of the accused or mitigates the offense, and, in connection with sentencing,

760  disclose to the defense and to the tribunal all unprivileged mitigating information

761  known to the prosecutor, except when the prosecutor is relieved of this responsibility

762  by a protective order of the tribunal; (e) not subpoena a lawyer in a grand jury or

763  other criminal proceeding to present evidence about a past or present client unless

764  the prosecutor reasonably believes: (1) the information sought is not protected from

disclosure by any applicable privilege; (2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and (3) there is no other feasible alternative to obtain the information; (f) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule. EPIDEMIC OF PROSECUTOR MISCONDUCT 12 (g) When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall: (1) promptly disclose that evidence to an appropriate court or authority, and (2) if the conviction was obtained in the prosecutor's jurisdiction, (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit. (h) When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction

**Ethical Rules**

The adversarial structure of the American justice system makes the lawyer's zealous advocacy on behalf of the client the linchpin of the process.38 Yet, the ethical rules that govern the legal profession single out prosecutors as the only participants who must adhere to a special duty beyond that of representing zealously their "client." This higher duty has been variously phrased to require the prosecutor "to seek justice, not merely to convict,"39 and "to serve as a minister of justice and not simply [as] an advocate."40

(pdfopenscholarship.wustl.edu/cgi/viewcontent.cgi?article=1482&context=law_lawreview)

**BRADY VIOLATIONS**

**U.S. SUPREME COURT**

Brady v. Maryland (U.S. 1963) held that a prosecutor under the Fifth and Fourteenth amendments have a duty to disclose favorable evidence to defendants upon request, if the evidence is "material" to either guilt or punishment.

800  Giles v. Maryland (U.S. 1967): After having been convicted of rape in a Maryland state

801  court, defendants brought a post-conviction proceeding, alleging that the prosecution

802  denied them due process of law by suppressing evidence favorable to them and by the

803  knowing use of perjured testimony against them. The presiding judge in the post-

804  conviction proceeding ordered a new trial on the ground that the petitioners' evidence

805  did not sustain the allegation of knowing use of perjured testimony by the

806  prosecution, but did establish the suppression of evidence concerning the credibility

807  of witnesses and the issue of consent, which constituted a denial of due process. This

808  judgment was reversed by the Court of Appeals of Maryland on the ground that the

809  evidence allegedly suppressed would not materially affect the determination of the

810  petitioners' guilt or the punishment to be imposed, and that the prosecution's failure

811  to disclose it was not so prejudicial as to warrant the granting of a new trial on the

812  basis of the denial of due process. Supreme Court vacated the judgment of the Maryland

813  Court of Appeals and remanded the case for further proceedings, even though the court

814  did not agree on an opinion.

815  Giglio v. United States (U.S. 1972): Withheld promise of immunity to con-conspirator

816  upon whose testimony the Government's case depended required reversal of conviction

817  because "evidence of any understanding or agreement as to a future prosecution would

818  be relevant to [co-conspirator's] credibility and the jury was entitled to know of

819  it."

820  United States v. Agurs (U.S. 1976): Prosecutor has a due process duty to disclose

821  evidence about a victim's criminal record, except (1) when the victim's record was not

822  requested by defense counsel and no inference of perjury by witness created; (2) if

823  the trial court remains convinced of defendant's guilt after the withheld evidence is

824  reviewed in light of entire trial record; and (3) the trial judge's firsthand

825  appraisal of the record is thorough and reasonable.

826  United States v. Bagley (U.S. 1985): Refined Brady by holding that a prosecutor's duty

827  to disclose material favorable evidence exists regardless of whether the defendant

828  makes a specific request. The Court said "favorable evidence" is "material" if there

829  is a reasonable probability that disclosure of the evidence would have produced a

830  different outcome. A "reasonable probability" is "a probability sufficient to

831  undermine confidence in the outcome."

832  Kyles v. Whitley (U.S. 1995): Accused entitled to a new trial because of the

833  prosecution's failure to comply with the due process obligation to disclose material

834  evidence favorable to the accused concerning his possible innocence of the crime

because the net effect of the withheld raised a reasonable probability that the evidence's disclosure to competent counsel would have produced a different result. Even if the prosecutor was not personally aware of the evidence, the State is not relieved of its duty to disclose because "the State" includes, in addition to the prosecutor, other lawyers and employees in his office and members of law.

Strickler v. Greene (U.S. 1999): Held that a Brady violation occurs when: (1) evidence is favorable to exculpation or impeachment; (2) the evidence is either willfully or inadvertently withheld by the prosecution; and (3) the withholding of the evidence is prejudicial to the defendant.

Cone v. Bell (U.S. 2009): Observed, without specifically holding, that a prosecutor's pre-trial obligations to disclose favorable or impeaching evidence, either to guilt or punishment, "may arise more broadly under a prosecutor's ethical or statutory obligations" than required by the Brady/Bagley post-conviction "materiality" standard of review. The court distinguished the post-conviction setting where the reviewing court must make a constitutional determination of whether the withheld evidence is material to the prosecutor's pre-trial broader ethical obligations to disclose, which requires a "prudent prosecutor [to] err on the side of transparency, resolving doubtful questions in favor of disclosure."

**FIRST CIRCUIT COURT OF APPEALS**

Mastracchio v. Vose: Brady violation because knowledge of witness payments or favors made by the Witness Protection team is discoverable.

**SECOND CIRCUIT COURT OF APPEALS**

United States v. Matthews (2nd Cir. 1994): Rule 16 violation because the government attorney withheld a letter written by the defendant instead of disclosing it within a timely manner.

Leka v. Portuondo(2nd Cir. 2001): Brady violation because off-duty policeman's undisclosed observations would have contradicted testimony of other witnesses.

Disimone v. Phillips (2nd Cir. 2006): Brady violation because exculpatory statement would have allowed the defense to investigate another party's involvement.

**THIRD CIRCUIT COURT OF APPEALS**

United States v. Pelullo (3d Cir. 1997): Brady violation because an FBI agent's undisclosed notes and FBI surveillance tapes could have been used to impeach government witness whose credibility was central to case.

Virgin Islands v. Fahie (3d Cir. 2005): Prosecutorial "bad faith" is "probative to materiality" as well as relevant to determining a remedy.

**FOURTH CIRCUIT COURT OF APPEALS**

Spicer v. Roxbury (4th Cir. 1999): Brady violation because prosecutors did not disclose witness's prior inconsistent statement that he did not see the defendant.

Monroe v. Angelone (4th 2003): That while some Brady material which comes to light post-trial may not constitute a violation because of redundancy, this does not "excuse [pre-trial] discovery obligations." While "materiality" may exist as a prosecutorial defense in the post-trial setting, it is not a license to make "materiality" determinations pre-trial.

**FIFTH CIRCUIT COURT OF APPEALS**

Guerra v. Johnson (5th Cir. 1996): Brady violation for failure to disclose police intimidation of key witnesses and information regarding suspect seen carrying murder weapon minutes after shooting.

United States v. Sipe (5th Cir. 2004): Brady violation because the cumulative effect of undisclosed statement, criminal history of witness, and benefit to testifying aliens undermined credibility of a key witness.

United States v. Miller (5th Cir. 2008): Brady violation because undisclosed referral letter could have been used to impeach witness at trial.

LaCaze v. Warden La. Corr. Inst. For Women (5th Cir. 2011): Brady violation because prosecution withheld material concerning promise made to co-defendant.

**SIXTH CIRCUIT COURT OF APPEALS**

Schledwitz v. United States (6th Cir. 1999): Brady violation because Government witness portrayed as neutral and disinterested expert had actually been investigating defendant for years.

Joseph v. Coyle (6th Cir. 2006): Brady violation because witnesses' undisclosed testimony transcripts, notes on witness interviews, and immunity agreement would have impeached prosecution's crucial witness.

O'Hara v. Brigano (6th Cir. 2007): Brady violation because undisclosed written statement by victim could have been used to impeach victim's testimony.

**SEVENTH CIRCUIT COURT OF APPEALS**

United States v. Boyd(7th Cir. 1995): Brady violation for failure to disclose drug use and dealing by Government witness and "continuous stream of unlawful favors" including phone privileges, presents, and special visits.

Crivens v. Roth (7th Cir. 1999): Brady violation because failure to disclose crimes committed by Government witness is Brady even when witness used aliases.

**EIGHTH CIRCUIT COURT OF APPEALS**

905 White v. Helling (8th Cir. 1999) found a Brady violation in a 27 year old murder case

906 because the Government did not disclose that its chief eyewitness had originally

907 identified someone else and identified the defendant only after several meetings with

908 the police.

909 United States v. Barraza-Cazares (8th Cir. 2006): Held that a co-defendant's statement

910 is exculpatory evidence because it is relevant to co-defendant's role in the offense.

911 **NINTH CIRCUIT COURT OF APPEALS**

912 United States v. Strifler (9th Cir. 1988): Brady violation when, after request by

913 defendant, Government does not disclose information in probation file relevant to

914 witness's credibility on ground that it was privileged.

915 Singh v. Prunty (9th Cir. 1998): Brady violation because of "favorable deal" given to

916 a star witness and not disclosed.

917 United States v. Santiago (9th Cir. 1995): Brady violation because prosecutor had

918 knowledge of and access to inmate files, including the defendant's files held by

919 Bureau of Prisons.

920 **ELEVENTH CIRCUIT COURT OF APPEALS**

921 Jacobs v. Singletary (11th Cir. 1992): Witness statements to a polygraph examiner

922 which were contrary to witness' trial testimony is exculpatory because the conflicting

923 statements were relevant to defendant's claim of innocence.

924 **D.C. CIRCUIT OF APPEALS**

925 United States v. Brooks (D.C. Cir. 1992): Brady violation if a specific request is

926 made by defendant and Government does not search records of police officer/witnesses.

927 United States v. Cuffie (D.C. Cir. 1996): Brady violation because undisclosed evidence

928 of witness's prior perjury could have impeached witness, even though the witness had

929 been impeached by a cocaine addiction, cooperation with prosecution, incentives to

930 lie, and violation of oath as police officer.

931 **TEXAS COURT OF CRIMINAL APPEALS**

932 Ex parte Mowbray (Tex. Crim. App. 1996): Brady violation because prosecutors failed to

933 disclose exculpatory expert report.

934 Leza v. State (Tex. Crim. App. 2011): Defendant attached two letters on direct appeal

935 that his appellate counsel received from an assistant district attorney, apparently in

936 relation to another case altogether. These letters informed appellate counsel that,

937 since the defendant's trial, a certain Bexar County deputy sheriff, not a witness at

938 either phase of the defendant's own trial, had been charged with aggravated perjury

939 and abuse of official capacity. When the relevance of these charges to defendant's

940 circumstances was not immediately apparent to appellate counsel, she contacted the

941 assistant district attorney for additional information, but none was provided.

942 Appellate counsel now avers that she believes the letter was most likely sent to her

943 by mistake, but in an abundance of caution she brings a claim that the State has

944 violated the appellant's due-process rights under Brady by suppressing evidence

945 favorable to him at the time of his trial. Obviously, the letters upon which the

946 defendant now relies are not any part of the appellate record in this case, and we

947 could not predicate any appellate relief upon them even if they did establish a Brady

948 violation. We therefore overrule the defendant's [Brady claim]—without prejudice, of

949 course, to pursue any Brady claim that further investigation might turn up pursuant to

950 his initial application for post-conviction writ of habeas corpus brought under

951 Article 11.071 of the Code of Criminal Procedure.

952 Pena v. State (Tex. Crim. App. 2011): Brady violation because prosecution failed to

953 disclose to defendant the audio portion of a videotape containing statements he made

954 to the police.

955 **U.S. SUPREME COURT**

956 Mooney v. Holohan (U.S. 1935): Misconduct through "knowing use" of perjured testimony

957 to convict a criminal defendant in violation of "due process" of law. Acts and

958 omissions by a prosecutor can violate "the fundamental conceptions of justice which

959 lie at the base of our civil and political institutions."

960 Berger v. United States (U.S. 1935): Prosecutor engaged "misconduct" through his trial

961 tactics by "misstating the facts in his cross-examination of witnesses; of putting

962 into the mouths of such witnesses things which they had not said; of suggesting by his

963 questions that statements had been made to him personally out of court in respect of

964 which no proof was offered; of pretending to understand that a witness had said

965 something which he had not said, and persistently cross-examining the witness upon

966 that basis; of assuming prejudicial facts not in evidence; of bullying and arguing

967 with witnesses; and, in general, of conducting himself in a thoroughly indecorous

968 manner."

969 Alcorta v. Texas (U.S. 1957): Due process violated by prosecution's "passive" use of

970 perjured testimony.

971 Napue v. Illinois (U.S. 1959): Held that "the failure of the prosecutor to correct the

972 testimony of the witness which he knew to be false denied petitioner due process of

973 law in violation of the Fourteenth Amendment."

974 Banks v. Dretke (U.S. 2004): Misconduct in capital murder case because prosecution

withheld information that would have discredited two prosecution witnesses, including one who was a paid I police informant and the other had coached by prosecution before testifying.

**TEXAS COURT OF CRIMINAL APPEALS**

Stein v. State (Tex. Crim. App. 1973): Misconduct warranting reversal of conviction and dismissal when prosecution repeatedly violated trial court order not to make personal remarks about defendant or present arguments outside the evidence.

Boyde v. State (Tex. Crim. App. 1974): Misconduct when prosecution deliberately elicits testimony from witness about defendant's guilt.

Dexter v. State (Tex. Crim. App. 1976): Misconduct when prosecution attempted to link defendant to "organized crime" by placing physical material not introduced into evidence.

Ex Parte Adams (Tex. Crim. App. 1989): Misconduct warranting reversal of conviction because prosecution suppressed favorable evidence, knowingly used perjured testimony, and deceiving trial court during the defendant's capital murder trial.

Duggan v. State (Tex. Crim. App. (1989): Misconduct and reversal of conviction required when prosecution fails to correct perjured testimony.

Ex parte Castellano (Tex. Crim. App. 1993): Misconduct and reversal of conviction required when perjured testimony by a police officer, although privately motivated, is utilized because such testimony is "imputable" to prosecution.

**TEXAS COURTS OF APPEALS**

Rogers v. State (Tex.App.—Houston [1st Dist.] 1987): Misconduct warranting reversal because prosecutor's cross-examination of both defendant and defendant's character witnesses was characterized by misconduct, including the assumption of inflammatory facts not in evidence, prejudicial remarks that expressed the prosecutor's personal opinions, and improper bolstering. Even though defendant failed to preserve many of the errors by timely objection, the errors were so pervasive that appellant was denied a fundamentally fair and impartial trial. The prosecutor's questions and side-bar comments only served the purpose of inflaming and prejudicing the jurors, and the record supported a finding that the prosecutor was not acting in good faith. The prejudicial effect of the prosecutor's remarks would not have been removed by instructions to disregard. The prosecutor's misconduct was so serious and pervasive that it undermined appellant's right to due process of law.

Young v. State (Tex.App.—Dallas 1988): Misconduct because prosecutor in jury argument tried defendant for fictitious attempted offense against police officers, and, thus,

prosecutor engaged in calculated misconduct to deprive the defendant of fair and impartial trial.

Ramirez v. State (Tex.App.—Austin 2002): Misconduct and reversal of conviction required because due process violated by prosecution's knowing use of perjured testimony.

**Types of misconduct further include:**

False confession

False arrest -- abetting

Falsified evidence

Intimidation

Police brutality -- abetting

Prosecutorial corruption

Political repression

Criminal profiling

Surveillance abuse -- abetting

Testifying -- Subornation of perjury

Failure to Disclose Exculpatory Evidence

Beyond Brady - National Seminar for Federal Defenders

Judge Donald W. Molloy's Order in U.S. v. W.R. Grace, No. 05-07-M-DWM (D. Mont. April 28, 2009)

Judge Emmet G. Sullivan's Letter Proposing Amendments to the Federal Rules of Criminal Procedure (April 28, 2009)

Judge Mark Wolf's Order in U.S. v. Jones, No. 07-10289-MLW (D. Mass. May 18, 2009)

Judge Mark Wolf's Letter to Attorney General Eric Holder (April 28, 2009)

Pleadings and Order in U.S. v. Frank Colacuricio, Sr., et al. (W.D. Wash. 2010)

Prosecution of Lindsey Manufacturing

Prosecution of Senator Ted Stevens and Related Special Prosecutor Investigation

In re G. Paul Howes, Opinion Holding Disbarment an Appropriate Sanction for a AUSA's Misconduct No. 10-BG-938, 39 A.3d 1 (D.C. Cir. March 8, 2013)

U.S. v. Chapman, Opinion Affirming Dismissal for Prosecutorial Misconduct, No. 06-10316 (9th Cir. May 6, 2008)

U.S. v. Clemens, Defendant's Motion and Memorandum of Law to Prohibit Retrial and to Dismiss the Indictment, No. 10-223 (D.D.C. July 29, 2011)

U.S. v. Jones, Memorandum Discussing Prosecutorial Misconduct and Order for Training and Response on the Propriety of Sanctions, No. 07-10289 (D. Mass. May 18, 2009)

(Judge Mark Wolf)

U.S. v. Ruehle, Dismissal of Indictment, No. 08-00139-CJC (C.D. Cal. Dec. 15, 2009) (transcript of Judge Carney dismissing the indictment against Broadcom's Henry Nicholas III and William Ruehle)

U.S. v. Shaygan, Order on Defendant's Motion for Sanctions Under Hyde Amendment, No. 08-20112-CR-Gold/McAliley (S.D. Fla. April 9, 2009) (Judge Alan S. Gold)

U.S. v. Slough, Memorandum Opinion Granting the Defendants' Motion to Dismiss the Indictment, No. 08-0360 (D.D.C. Dec. 31, 2009) (Judge Ricardo M. Urbina) (Blackwater Case)

U.S. v. W.R. Grace, Jury Instruction Given During Trial on Witness Bob Locke's Bias, No. CR 05-07-M-DWM (D. Mont. April 29, 2009) (Judge Donald W. Molloy)

**Definition Once Again:**

Prosecutorial misconduct is defined as the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (People v. Hill (1998) 17 Cal.4th 800, 819; People v. Espinosa (1992) 3 Cal.4th 806, 820; People v. Pitts (1990) 223 Cal.App.3d 606, 691.)

When alleging misconduct, a defendant need not make a showing that the prosecutor acted in bad faith. (People v. Benson (1990) 52 Cal.3d 754, 793.) The test on appeal is not prosecutorial intent, but the effect on the defendant. (People v. Vargas (2001) 91 Cal.App.4th 506.) Thus, the California Supreme Court has noted that the term "prosecutorial misconduct" is somewhat of a misnomer in that "it suggests a prosecutor must act with a culpable state of mind. A more apt description ... is prosecutorial error." (People v. Hill, supra, 17 Cal.4th at p. 823, fn. 1.)

A prosecutor may not justify misconduct by saying that defense counsel "started it" or that he was merely responding to defense counsel's improper argument. (People v. Perry (1972) 7 Cal.3d 756, 790.) Prosecutors are held to an elevated standard of conduct to that imposed on other attorneys because of the unique function they perform in representing the interests, and in exercising the sovereign power, of the state. (People v. Kelley (1977) 75 Cal.App.3d 672, 690.) As the United States Supreme Court has noted, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (Berger v. United States (1935) 295 U.S. 78, 88 [55 S.Ct. 629, 633; 79 L.Ed. 1314, 1321].)

The standards used to evaluate prosecutorial misconduct are well established. "A

prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'" (People v. Gionis (1995) 9 Cal.4th 1196, 1214.)

But even if the conduct does not render a trial fundamentally unfair, the actions may nevertheless, be misconduct under state law, if they involve "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (People v. Price (1991) 1 Cal.4th 324, 447.)

And finally, one should consider whether the waiver problem can be resolved by showing counsel was ineffective for failing to object to the misconduct. (See e.g., People v. Anzalone (2005) 130 Cal.App.4th 146, 159 [finding on direct appeal that trial counsel was ineffective for failing to object to the prosecutor's misstatement of the law related to concept of concurrent intent]; People v. Rodrigues (1994) 8 Cal.4th 1060, 1125-26 ["we will reach the merits in response to defendant's assertion that the failure to assign misconduct constituted ineffective assistance of counsel."])

**Judge Patrick Rohland on or around September 1st of 2015 intentionally conspired with the Redwood County Sheriff's Department, City of Morgan Police Department, District Attorney Steven Collins, Assistant District Attorney Jenna Peterson-Haler, Assistant District Attorney Kelly Meehan, Public Defender Erica Allex, Public Defender Joel Solie, Defense Attorney Paul Hunt, Defense Attorney Megan Burkhammer, Defense Attorney Ryan Garry, Defense Attorney Eric Olson, Redwood County District Court Administrator Patty Amberg and Redwood County District Court Transcriber Jodi Haen to intentionally deprive the Plaintiff of his Civil and Constitutional rights by violating his oath and duty as an elected public official by committing Judicial Misconduct and Fraud so egregious that it "shocks the conscious".**

Judge Patrick Rohland and the Redwood County District Court displayed a pattern of behavior and conduct that was prejudicial to the effective and expeditious administration of the business of the courts.

Judge Patrick Rohland and the Redwood County District Court failed to respond to the Plaintiffs motions of Tort Liability with Opportunity to Cure, Violation Warning – Denial of Rights Under Color of Law, Notice of Lack of Subject Matter Jurisdiction and multiple Certificates of Non-Response. All motions were signed, dated, notarized and sent via certified mail by the Plaintiff, signed for and received by the Redwood County District Court.

Judge Patrick Rohland conspired with the prosecution and the Plaintiff's defense

attorneys to convince the Plaintiff that he and his brother were co-defendants in the same case which Judge Rohland openly stated in court, the prosecution stated in email correspondences and legal briefs. The Plaintiff's Defense Attorney also informed the Plaintiff that this is truth and has been thoroughly documented as such. Although the Plaintiff is now aware that his brother in reality, is a completely separate criminal case but are charged with almost identical offenses.

Judge Patrick Rohland displayed a pattern of behavior that violates his oath and duties of office as an elected public official.

Judge Patrick Rohland intentionally allowed a fraudulent search warrant be used against the Plaintiff.

Judge Patrick Rohland intentionally and with complete recklessness, falsified the "Statement of Facts".

Judge Patrick Rohland intentionally granted "continuances" to the prosecution and deprived the Plaintiff of his right to a speedy trial.

Judge Patrick Rohland's pattern of behavior displaying a complete lack of competence, violated the Plaintiff's rights.

Judge Patrick Rohland's pattern of neglect and improper performance of administrative duties violated the Plaintiff's rights.

Judge Patrick Rohland violated the Code of Conduct for United States Judges.

Judge Patrick Rohland and the Redwood County District Court deprived the Plaintiff of a first appearance allowing the Plaintiff to be held well beyond the 48-hour rule as well as using a fraudulent Ex Parta order against the Plaintiff.

Judge Patrick Rohland abused his power and Obstructed Justice during criminal proceedings against the Plaintiff.

Judge Patrick Rohland allowed the prosecution to use a false narrative and made the Plaintiff guilty before proven innocent.

Judge Patrick Rohland intentionally deprived the Plaintiff his right to have representation for a Bail Hearing in order to use evidence obtained fraudulently against the Plaintiff.

Judge Patrick Rohland's Bail was excessive and lacking probable cause, as was his Bail Restrictions which created bias and tainted the fairness of proceedings and deprived the Plaintiff of his right to due process.

Judge Patrick Rohland refused a motion to recuse himself due to his bias against the Plaintiff and desire to protect the unlawful conduct of the prosecution and law enforcement.

Judge Patrick Rohland refused a motion filed by the Plaintiff to transfer venues in order to protect himself and the unlawful conduct of the prosecution and law enforcement under 42 U.S.C. §1443 Removal of State Criminal Prosecutions to Federal Court for Deprivation of Rights Under Color of Law in violation of Title 18 U.S.C. 241, 242, 243.

Judge Patrick Rohland intentionally conspired with the prosecution, public defenders and defense attorneys in his chambers prior to court hearings.

Judge Patrick Rohland allowed an illegal joinder of charges and did not remedy the issue creating bias against the Plaintiff.

Judge Patrick Rohland intentionally conspired with the prosecution, public defenders, and defense attorneys during court proceedings by allowing them to continuingly approach the bench and talk under white noise audio played loudly over court speakers. Judge Patrick Rohland was made aware that the Plaintiff had evidence of law enforcement and prosecutorial misconduct during a pre-trial hearing, on the record, in which the Plaintiff was requesting a Franks Hearing to address the violations of his rights and challenging the affidavit of the initial search warrant on or around September 2015. Judge Patrick Rohland intentionally ignored the Plaintiff for two years when Judge Patrick Rohland then ordered the Plaintiff's attorney to make Franks arguments via email only, and not in court. Judge Patrick Rohland's improper correspondence was a repeated pattern of behavior, having the Plaintiff and his representation make legal arguments directly through email correspondence with himself and Jenna Peterson Haler using their redwood county email addresses, which is illegal and unethical. Clearly this was an attempt to not have any civil and constitutional right violations addressed in court and to confuse the Plaintiff regarding what is legal and illegal professional conduct. All emails have been printed out and thoroughly documented. Judge Patrick Rohland intentionally did not allow the Plaintiff to be heard regarding a Franks Hearing in court, because it would prove the Plaintiff's rights were violated.

Judge Patrick Rohland would clear the courtroom of all people who were currently seated inside the court waiting for their own hearings and instructed all law enforcement to not allow anyone with a court date to appear as to have no one present for the Plaintiff's hearings. Judge Patrick Rohland would then conduct hearings "off the record". The Plaintiff then requested all audio, video and transcripts to be provided to him. Redwood County District Court did not provide any video or audio of any of the Plaintiffs hearings as they did not record either audio

1185 or video as required by law, or intentionally destroyed them. The Plaintiff then

1186 requested all transcripts from all court appearances in which court transcriber Jodi

1187 Haen charged the Plaintiff over five hundred dollars and five months later provided

1188 the Plaintiff with only a total of four transcribed court appearances that contradicts

1189 the amount of times the Plaintiff was in court according the official Register of

1190 Events. The transcribed court hearings that were provided to the Plaintiff contained

1191 more fraudulent information and the transcripts were clearly tampered with. For

1192 example, the tampered court transcripts included incorrect dates and times as well as

1193 the claim that the Plaintiff was being prosecuted by a District Attorney who has

1194 never appeared in the Redwood County District Court but in reality, works in a

1195 completely different city and county and is in no way affiliated with the Redwood

1196 County District Court.

1197 Judge Patrick Rohland continued his improper correspondence by having the Plaintiff

1198 and his representation make legal arguments directly through email correspondence with

1199 himself and Jenna Peterson Haler using their Redwood County email addresses. This was

1200 done to not allow misconduct to be heard on the record in Court. Clearly this was an

1201 attempt to not have any civil and constitutional right violations addressed in court

1202 and to confuse the Plaintiff regarding what is legal and illegal professional conduct.

1203 All emails have been printed out and thoroughly documented.

1204 Judge Patrick Rohland allowed both public defenders to resign, allowed three

1205 prosecutors to resign and allowed a total of four defense attorneys to resign without

1206 cause and without the Plaintiff allowed to have a voice in the matter and creating

1207 further bias, unfairness and lack of due process.

1208 Judge Patrick Rohland conspired with the Prosecution in drafting motions and briefs in

1209 which he would already be aware and rule in favor of by using color of law to

1210 misrepresent and mislead the Plaintiff. For example, that "an omnibus and franks

1211 hearing is the same kind of hearing" but then not allowing the Plaintiff to make

1212 arguments in court regarding the statements made in the affidavits of the initial

1213 search warrant. Obviously because they are not the same thing.

1214 Judge Patrick Rohland refused to address law enforcement misconduct, prosecutorial

1215 misconduct and allowed unethical behavior to continue inside the courtroom for over

1216 four years and decided to do nothing in order to protect himself and his employees

1217 from civil liability.

1218 Judge Patrick Rohland intentionally used what he knew to be evidence both fabricated

1219 and obtained fraudulently, to be used against the Plaintiff when making judgements and

1220  rulings during court hearings.

1221  Judge Patrick Rohland and the Redwood County District Court conspired to destroy and
1222  tamper with evidence beneficial to the Plaintiff.

1223  Judge Patrick Rohland was a District attorney for Redwood County before Governor Mark
1224  Dayton appointed Patrick Rohland Judge of that same county, creating a bias and
1225  conflict of interest against the Plaintiff.

1226  The Plaintiff, in an attempt to seek relief, filed notarized complaints with Head
1227  Administrator for the 5th District Court Michael Kelly, the Minnesota board of Judicial
1228  Standards, Lawyers Board of Professional Conduct, Office of Lawyers Professional
1229  Responsibility, Attorney General Lori Swanson, Minnesota State Senator Amy Klobuchar,
1230  the Minnesota Division of the Federal Bureau of Investigation, Director of The Federal
1231  Bureau of Investigation Christopher Way and C/O Federal Bureau of Investigation
1232  Headquarters in Washington DC Civil Rights Division, the United States Department of
1233  Justice, Director of the IRS Civil Rights Division in Washington DC, Deputy Inspector
1234  General for Investigations Gary L. Cantrell for contract fraud, misrepresenting a
1235  projects status to continue receiving government funds and falsifying data relating to
1236  the involvement of Redwood County District Court Officials, the Minnesota Department
1237  of Human Services, the New Horizons Treatment Center and fraud committed by the
1238  Minnesota Bureau of Criminal Apprehension.

1239  **Judicial Misconduct Rules – United States Court of Appeals for the Fifth Circuit**

1240  Misconduct may be entirely or substantially related to a judge's duties or power.
1241  "Misconduct related to a judge's duties or power" includes demeanor and statements on
1242  the bench, on-bench abuse of authority (including misuse of the contempt power),
1243  conduct toward court staff (including sexual harassment), off-bench abuse of office,
1244  failure to disqualify, administrative malfeasance, ex parte communications, and
1245  failure to cooperate with the conduct commission. Most cases also involved more than
1246  one act of misconduct, and most involved more than one category.

1247  Judicial misconduct occurs when a judge acts in ways that are considered unethical or
1248  otherwise violate the judge's obligations of impartial conduct.

1249  A court decision is not beyond critique. Defendants may be coaxed to enter into plea
1250  bargains that rob the public from a fair trial and from knowing the truth. Court
1251  decisions cannot be assumed just. They are subject to critical public appraisal as any
1252  human decision.

1253  Misconduct prejudicial to the effective and expeditious administration of the business
1254  of the courts (as an extreme example: "falsification of facts" at summary judgment);

using the judge's office to obtain special treatment for friends or relatives;
accepting bribes, gifts, or other personal favors related to the judicial office;
having improper discussions with parties or counsel for one side in a case; treating
litigants or attorneys in a demonstrably egregious and hostile manner; violating other
specific, mandatory standards of judicial conduct, such as judicial rules of procedure
or evidence, or those pertaining to restrictions on outside income and requirements
for financial disclosure; and acting outside the jurisdiction of the court, or
performance of official duties if the conduct might have a prejudicial effect on the
administration of the business of the courts among reasonable people. Rules of
official misconduct also includes rules concerning disability, which is a temporary or
permanent condition rendering judge unable to discharge the duties of the particular
judicial office.

**Judicial Misconduct Further Examples**

Judge was removed for lack of competence to handle the duties of the office. In re
Baber, 847 S.W.2d 800 (Missouri 1993)

Pekarski v. Judicial Inquiry and Review Board, 639 A.2d 759 (Pennsylvania 1994), the
Pennsylvania Supreme Court ordered a judge removed from office for failing to recuse
himself on numerous occasions.

Judge was removed for lack of regard and in violation for the most elementary
procedural rules and rights of individuals in two cases. In the Matter of Hamel, 668
N.E.2d 390 (New York 1996), the New York Court of Appeals accepted the determination
of the State Commission on Judicial Conduct.

Judges were removed for neglect or improper performance of administrative duties.
Inquiry Concerning O'Neal, 454 S.E.2d780 (Georgia 1995), the Georgia Supreme Court
removed a magistrate from office for an uncooperative working relationship with the
county board of commissioners.

Texas Supreme Court removed from office a judge who had (1) altered and fabricated
criminal dock-et sheets, official receipts for fines, and monthly reports of
collection, (2) furnished those false documents to the State Commission on Judicial
Con-duct, (3) failed to report money he collected to the county auditor as required,
(4) cashed certain checks and money orders but failed to remit the monies to the
county treasurer, and (5) failed to forward an abstract of the record of convictions
in six cases to the department of public safety. Judge Lewie Hilton, Judgment (Special
Court of Review Appointed by Texas Supreme Court February 7th, 1991

In re Keith, No. 93-CC-1, Order (Illinois Courts Commission January 21, 1994), the

Illinois Courts Commission removed from office a judge who consistently, brazenly, and outrageous-ly evinced a complete lack of judicial temperament and demeanor, a disrespect for judicial process and procedures, and a deep-seated person-al contempt and disrespect for citizens appearing in his courtroom.

The Judicial Conduct and Disability Act allows "[a]ny person alleging that a judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" to file a complaint against the judge. See 28 U.S.C. § 351(a Rule 3(h) defines "cognizable misconduct" as including "conduct prejudicial to the effective and expeditious administration of the business of the courts" and "conduct occurring outside the performance of official duties if the conduct might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people."

 "A Judge Should Avoid Impropriety And The Appearance of Impropriety In All Activities." The Commentary to Canon 2A states that "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances . . . would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges." (Emphasis added.) Canon 3A provides that a "judge should be patient, dignified, respectful, and courteous" to all persons "with whom the judge deals in an official capacity." (Emphasis added.) 4 See Code of Conduct for United States Judges, Canon 1 (". . . A judge should maintain and enforce high standards of conduct and should personally observe those standards[.]").

**Judge Patrick Rohland not only broke Federal Law but also the Code of Conduct for United States Judges.**

Canon 1 of the Code of Conduct for United States Judges provides that "[a] judge should uphold the integrity and independence of the judiciary." (Emphasis added.) The explanation of Canon 1 states that an "honorable judiciary is indispensable to justice in our society. A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be observed." (Emphasis added.) The Commentary to Canon 1 further provides that "[d]eference to the judgments and ruling of courts depends on public confidence in the integrity and independence of judges." (Emphasis added.)

Canon 2 of the Code of Conduct for United States Judges provides that "a judge should avoid impropriety and the appearance of impropriety in all activities." (Emphasis

added.) Canon 2A is entitled "Respect for Law." It provides that "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." (Emphasis added.) This rule is "critical—the judiciary's ability to decide cases efficiently and effectively would be severely impaired, and public confidence in the courts would be undermined, if litigants had reason to suspect judicial bias. In other words, 'to perform its high function in the best way "justice must satisfy the appearance of justice."'

Canon 3 of the Code of Conduct of United States Judges provides that "a judge should perform the duties of the office fairly, impartially, and diligently." (Emphasis added.) Canon 3A(3) provides that "[a] judge should be patient, dignified, respectful, and courteous" to all persons "with whom the judge deals in an official capacity." The Commentary to Canon 3A states that "[t]he duty to be respectful includes the responsibility to avoid comment or behavior that could be interpreted as harassment, prejudice or bias."

Canon 4 recognizes that a judge may engage in "extrajudicial activities, including lecturing on both law-related and nonlegal subjects." However, Canon 4 imposes important limitations on such activities, including that "a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office [or] reflect adversely on the judge's impartiality . . . ." (Emphasis added.) Similarly, Canon 4 states that participation in extrajudicial activities is permissible only "[t]o the extent that the judge's . . . impartiality is not compromised . . . ." As discussed at length above, Complainants submit that no objective observer or "reasonable mind" could conclude after Judge Jones's speech that Judge Jones is "impartial" on the death penalty, the constitutionality of the death penalty, or capital cases involving the defenses of racism, actual innocence, "mental retardation," or international standards.

**Violation of Request to Transfer**

Transfer the proceeding to the judicial council of another circuit. Rule 26 expressly authorizes this transfer. The Commentary to Rule 26 states that "[s]uch transfers may be appropriate . . . where the issues are highly visible and a local disposition may weaken public confidence . . . ."

**Amendment Violations**

A judge or magistrate will decide whether an arrested person may be released while his or her criminal case is pending. This is true in each state and federal district in

the United States. Some laws prohibit release. Whether a defendant receives a free lawyer to advocate for his or her release at the initial bail hearing has been a function of statute or rule.

When the Supreme Court upheld the federal Bail Reform Act of 1984, part of the basis was that the statute provided a right to counsel. (United States v. Salerno, 481 U.S. 739, 751 (1987).) Since *Salerno* (and a later case interpreting the Bail Reform Act), there have been no Supreme Court cases addressing the right to bail or the procedures accompanying that right. The closest, and the one that may ultimately lead to a constitutionally recognized right to counsel at bail hearings, is *Rothgery v. Gillespie County, Texas*. (554 U.S. 191 (2008).)

The New York Court of Appeals stated, "There is no question that 'a bail hearing is a critical stage of the State's criminal process.'" (Hurrell-Harring v. State, 930 N.E.2d 217, 223 (N.Y. 2010).) The Connecticut Supreme Court also found that the defendant's bail hearing is a critical stage. (Gonzalez v. Comm'r of Correction, 68 A.3d 624, 63536 (Conn.), *cert. denied*, 134 S. Ct. 639 (2013).) Even before *Rothgery*, bail hearings were found to be critical stages of trial by courts in Pennsylvania, New Jersey, and North Carolina. (*See* Ditch v. Grace, 479 F.3d 249, 253 (3d Cir. 2007); State v. Fann, 571 A.2d 1023, 1026 (N.J. Super. Ct. Law Div. 1990); State v. Detter, 260 S.E.2d 567, 583 (N.C. 1979).)

Critical stages of trial include all pretrial proceedings where a lawyer's presence can assist the defendant. (*See* Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012) (plea negotiations); Coleman v. Alabama, 399 U.S. 1 (1970) (preliminary hearings); United States v. Wade, 388 U.S. 218 (1967) (postindictment lineups); Hamilton v. Alabama, 368 U.S. 52 (1961)

United States district judge provided an explanation of why counsel is necessary at bail hearings:

*[I]f counsel can review and cogently represent his incarcerated client, a court might reduce or eliminate a money bond, permitting the client to be released from incarceration pending trial. . . .The accused are frequently ignorant of their legal rights and unaware of the steps which must be taken to trigger prompt processing of the case pending against them. It must also be recognized that courts are more readily able to communicate with attorneys than prisoners and are more likely to rely upon the representations of an attorney in deciding whether to release a defendant pending trial or to dismiss the charges against him.*

(Alberti v. Sheriff of Harris Cnty., Tex., 406 F. Supp. 649, 660 (S.D. Tex. 1975).)

In March 2015, it issued its report *Don't I Need a Lawyer? Pretrial Justice and the Right to Counsel at First Judicial Bail Hearing*. The committee included former FBI Director William S. Sessions, Former Deputy Attorney General Larry D. Thompson, prominent law professors, and policy analysts. The report made six recommendations, the first being: "Jurisdictions should appoint counsel in a timely manner prior to initial bail and release hearings." (*Id.* at 36-37.) In 2014, the Sixth Amendment Center and the Pretrial Justice Institute issued *Early Appointment of Counsel: The Law, Implementation, and Benefits*. The report stated:

*[W]here no attorney is present to represent the indigent defendant, there is no one who can present evidence to the magistrate to demonstrate that the defendant is not a threat to public safety and should be released pending trial, or that the defendant has ties to the community such that he will most assuredly appear at all court proceedings, or that the defendant does not have any resources with which to pay bail money.*

The United States Supreme Court has held that the right to counsel attaches at a defendant's initial appearance in court to face charges. Once that right attaches, counsel must represent the defendant at every critical stage of trial. The initial bail hearing is a critical stage of trial because a lawyer can show the magistrate why the defendant is likely to appear at future proceedings, why the defendant is unlikely to be a danger, and why conditions of release are suitable and do not punish the defendant for lack of money. This is not something unrepresented defendants can do. As in all other pretrial proceedings that the Supreme Court has applied the Sixth Amendment right to counsel, lawyers are necessary at initial bail hearings.

The Sixth Circuit agrees that, when probable cause is established "for one crime but [the warrant is] designed and requested [to] search for evidence of an entirely different crime (child pornography)," it is "beyond dispute that the warrant [i]s defective." United States v. Hodson, 543 F.3d 286, 292 (6th Cir. 2008).

nothing in the affidavit draws a correlation between a person's propensity to commit both types of crimes." Falso, 544 F.3d at 123.

We noted that "[i]t goes without saying that the government could not search Weber's house for evidence to prove Weber was a collector merely by alleging he was a collector." Id. We distinguished the probable cause demonstrated in the affidavit in Weber from the affidavit in United States v. Rabe, 848 F.2d 994 (9th Cir.1988).

that the warrant was "so lacking in indicia of probable cause that" not even the good-faith exception to unlawfully executed warrants could apply. Id. at 292-93.

1430 The Third Circuit in the Baldi case construed that statement in Pyle v. Kansas to mean

1431 that the "suppression of evidence favorable" to the accused was itself sufficient to

1432 amount to a denial of due process. 195 F. 2d, at 820.

1433 "The same result obtains when the State, although not soliciting false evidence,

1434 allows it to go uncorrected when it appears." And see Alcorta v. Texas, 355 U. S. 28;

1435 Wilde v. Wyoming, 362 U. S. 607. Cf. Durley v. Mayo, 351 U. S. 277, 285.

1436 We now hold that the suppression by the prosecution of evidence favorable to an

1437 accused upon request violates due process where the evidence is material either to

1438 guilt or to punishment, irrespective of the good faith or bad faith of the

1439 prosecution. Brady v. Maryland

1440 A prosecution that withholds evidence on demand of an accused which, if made

1441 available, tend to exculpate him or reduce the penalty helps shape a trial that bears

1442 heavily on the defendant. That casts the prosecutor in the role of an architect of a

1443 proceeding that does not comport with standards of justice, even though, as in the

1444 present case, his action is not "the result of guile," to use the words of the Court

1445 of Appeals. 226 Md., at 427, 174 A. 2d, at 169.

1446 The Fourth Amendment safeguards individuals' right "to be secure in their persons,

1447 houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

1448 amend. IV. "`At the very core'" of this right "`stands the right of a man to retreat

1449 into his own home and there be free from unreasonable governmental intrusion.'" Kyllo

1450 v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting

1451 Silverman v. United 694*694 States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734

1452 (1961)). The Constitution makes clear that no search warrant for a residence may issue

1453 except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.

1454 In furtherance of this guarantee, a search warrant will be granted only if there is a

1455 "nexus between the place to be searched and the evidence sought." United States v.

1456 Carpenter, 360 F.3d 591, 594 (6th Cir.2004).

1457 It is axiomatic that to establish the requisite nexus, "a warrant application must

1458 show more than just that `the owner of the property is suspected of crime.'" United

1459 States v. Gunter, 266 Fed.Appx. 415, 418 (6th Cir.2008) (quoting Zurcher v. Stanford

1460 Daily, 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)). And no citation

1461 should be required to establish that "[t]he mere fact that someone is a drug dealer" —

1462 much less a former drug dealer, or an associate of a suspected drug dealer — "is not

1463 alone sufficient to establish probable cause to search their home." Id.; see also

1464 United States v. Frazier, 423 F.3d 526, 533 (6th Cir.2005).

After summarizing the type of evidence that we have previously deemed adequate to

support a search warrant, the majority aptly states that "presented no such evidence

to the magistrate judge to support the search warrant issued in this case." Maj. Op.

at 687. Explains that:

The affidavit supporting the search warrant was devoid of information establishing a

nexus between the alleged illegal activity and Defendant's home, I respectfully

dissent.

In Murray v. United States, the Supreme Court explained that the Fourth Amendment's

"exclusionary rule... prohibits the introduction of derivative evidence ... that is

the product of the primary evidence, or that is otherwise acquired as an indirect

result of the unlawful search, up to the point at which the connection with the

unlawful search becomes so attenuated [sic] as to dissipate the taint." 487 U.S. 533,

536-37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (internal quotation marks omitted).

However, the point of the rule is "in deterring unlawful police conduct" and "putting

the police in the same, not a worse, position that they would have been in if no

police error or misconduct had occurred." Id. at 537, 108 S.Ct. 2529 (emphasis in

original) (quoting Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377

(1984)).

Earls, 70 A.3d at 632 (reasonable expectation of privacy in location of cell phones);

Tracey v. State, 152 So.3d 504, 526 (Fla.2014) (objectively reasonable expectation of

privacy in "location as signaled by one's cell phone"); In re Application of U.S. for

an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849

F.Supp.2d 526, 539 (D.Md.2011)

The nexus is insufficient to support a search warrant. In United States v. McPhearson,

469 F.3d 518, 524-25 (6th Cir.2006), "[t]hese averments were insufficient to establish

probable cause because they do not establish the requisite nexus between the place to

be searched and the evidence to be sought." Id. at 524.

So lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable." United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82

L.Ed.2d 677 (1984).

"[w]hen the police exhibit `deliberate,' `reckless,' or `grossly negligent' disregard

for Fourth Amendment rights, the deterrent value of exclusion [of evidence] is strong

and tends to outweigh the resulting costs." Id. at 2427 (quoting Herring v. United

States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)).

The good faith exception did not apply because the affidavit supporting the search

warrant was "so vague as to be conclusory or meaningless." McPhearson, 469 F.3d at 527

United States v. Hython, 443 F.3d 480, 489 (6th Cir.2006), where the search warrant

affidavit was so "patently insufficient" that "[n]o well-trained officer could have

reasonably relied on" it, or United States v. Laughton, 409 F.3d 744, 748, 751 (6th

Cir.2005), where "[n]o reasonable officer could have believed" that the "bare bones"

affidavit was sufficient to establish probable cause to search.

United States v. Lopez-Medina, 461 F.3d 724, 746 (6th Cir. 2006). Plain error exists

if there is an "(1) error (2) that was obvious or clear; (3) that affected defendant's

substantial rights; and (4) that affected the fairness, 692*692 integrity, or public

reputation of the judicial proceedings." United States v. Vonner, 516 F.3d 382, 386

(6th Cir.2008).

**Public Defenders Erica Allex, Joel Solie and Defense Attorney's Megan Burkhammer, Paul Hunt, Eric Olson and Ryan Garry intentionally conspired with the Redwood County Sheriff's Department, City of Morgan Police Department, Judge Patrick Rohland, District Attorney Steven Collins, Assistant District Attorney Jenna Peterson-Haler to deprive the Plaintiff of his Civil and Constitutional rights by committing misconduct, fraud and malpractice so egregious that it "shocks the conscious".**

The Defendants' failed to report the misconduct of the Court as required by State and Federal law.

The Defendants' failed to exercise the ordinarily reasonable skill and knowledge commonly possessed by a member of the legal profession, where that failure damaged the Plaintiff.

The Defendants' failed to comply with Model Rules of Professional Conduct.

The defendants' failed to provide competent representation to the Plaintiff. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

The Defendants' did not act with reasonable diligence and promptness in representing the Plaintiff and failed to adequately, professionally, competently, or zealously represent the Plaintiff.

The Defendants refused to represent the Plaintiff for political or professional motives.

The Defendants repeatedly made false or misleading statements to the Plaintiff.

The Defendants abandoned the Plaintiff.

The Defendants failed to disclose all relevant facts to the Plaintiff.

The Defendants argued a position while neglecting to disclose prior law which might

counter the argument on behalf of the Plaintiff.

Erica Allex represented the Plaintiff and her actions directly impacted the Plaintiff's brother's case as the court considered the Plaintiff co-defendants with his brother in the same case, but in reality, the Plaintiff and his brother have different cases.

Eric Allex made statements that "the court can deem anything probable cause, but do not need much in order for there to be probable cause, therefor will not challenge probable cause on his behalf."

Erica Allex stated via email correspondence that a Franks Hearing did not exist and that in Minnesota "the title of a hearing doesn't matter".

Erica stated in Court to the Judge and Prosecutors Kelly Meehan and Jenna Paterson-Haler, "I guess a Franks Hearing is necessary according to my client". At this point, the prosecution displayed unprofessional behavior with an outburst of anger, immediately Kelly Meehan asked for herself, Jenna Peterson-Haler and Erica Allex permission to approach the bench. Permission was granted by Judge Rohland who turned on "audio static" and proceeded to conspire. After several minutes a continuance was issued without cause, in which Judge Patrick Rohland, Kelly Meehan and Jenna Peterson-Haler ensured a Franks Hearing would never be heard.

Erica Allex became admittingly "scared of what's happening" and refused further representation. Erica Allex then proceeded to immediately resign from her position as a Public Defender in Redwood County 5th Judicial District and transferred to the 8th Judicial District in Willmar, MN.

Joel Solie represented the Plaintiff's brother and stated to the Plaintiff's brother that there "is no such thing as a Franks Hearing" and informed that the Plaintiff's brother that "the court will not allow us to challenge the initial search warrant, but are fine with you challenging the second search warrant".

Joel Solie informed the Plaintiffs brother that no evidence is contained on the disk labeled "Sarah's Confession" when both the Plaintiff's brother and Joel Solie viewed the disk on Jolie Solie's computer. Joel Solie said he would contact the prosecution regarding this issue in which he informed the Plaintiff's brother he did during their next meeting. At this meeting Joel Solie then apologized and informed the Plaintiff that he will not be unable to represent him further. Joel Solie then proceeded to give the Plaintiff's brother a package containing information Chapter 27 which talks about the legal procedures of Court Filing and the Plaintiff believes this was an attempt to assist and advise the Plaintiff's brother of how the Redwood County

1570 Court is committing Fraud. The Plaintiff wants to state that this is his own

1571 speculation, as to why Joel Solie gave his brother that information is unknown.

1572     Paul Hunt was initially enthusiastic about helping the Plaintiff. Paul

1573 Hunt recommended the Plaintiff's brother to Megan Burkhammer for representation. Paul

1574 Hunt tried to have Judge Rohland recuse himself from the case due to Bias, Prejudice

1575 and the misconduct of public defenders and law enforcement. Judge Rohland denied

1576 recusing himself with the intention of fixing the problem citing a court case from

1577 1991. When the judge did not recuse himself, Paul thought it was best that we argue

1578 for a full dismissal of all charges due to an invalid search warrant and everything

1579 else would be tossed out by fruit of the poisonous tree. Paul Hunt then had private

1580 discussions with the prosecution and Megan Burkhammer in which Paul Hunts behavior

1581 completely changed.

1582 Paul Hunt would then advise against challenging any and all civil and constitutional

1583 right violations as it "would only anger Rohland and the prosecution making our case

1584 harder". At that point, Paul Hunt's cowardice was acknowledged via email in which Paul

1585 Hunt was being "intimidated" and refused to be a part of the case and withdrew his

1586 representation.

1587     Megan Burkhammer was initially enthusiastic representing the Plaintiff's brother

1588 and would make statements via email that "we'll get those cops for their misconduct"

1589 but after her appearing in court for the first time discovered that she went to law

1590 school with Jenna Peterson and knew each other "back in the day". Megan Burkhammer

1591 would then have "coffee dates" with Jenna Peterson-Haler after which Megan

1592 Burkhammer's behavior and enthusiasm changed completely. Megan Burkhammer would then

1593 advise the Plaintiff's brother via email that "any right violations are to be only

1594 addressed during trail and not pre-trial" and a "Franks Hearing was the same thing as

1595 an Omnibus Hearing" and "we cannot argue the facts of the prosecution, it is not he-

1596 said she-said regarding whose facts are correct and whose aren't". Megan Burkhammer

1597 after conspiring with Jenna Peterson-Haler would attempt to get the Plaintiff's

1598 brother to violate his terms of release by "making contacting the minor".  Megan

1599 Burkhammer conspired further with Jenna Peterson-Haler to tamper with and destroy

1600 evidence beneficial to the Plaintiff. They withheld a letter written by the minor

1601 accused of sexual misconduct with the Plaintiff's brother prior to the issuing of an

1602 Ex Parta forcing the removal of her twitter account which provided evidence beneficial

1603 to the Plaintiff. The Plaintiff's brother, aware of the ongoing misconduct took

1604 pictures of the social media account before it's destruction as evidence prior to

1605 informing Megan Burkhammer of its contents; assuming she would continue to work

1606 against the Plaintiff as she then proceeded to confirm. The Plaintiff's brother

1607 realizing that the misconduct won't stop taking place, confronted Megan Burkhammer,

1608 who then on instruction from Jenna Peterson-Haler, created prejudice through

1609 fraudulent statements in her motion to withdrawal in which the Plaintiff wasn't

1610 allowed to defend himself from her accusations in Court.

1611 Ryan Garry represented the Plaintiff and described himself ironically as

1612 "the kind of attorney who doesn't let any kind of small-town court push him around"

1613 and bolstered about high profile clients and cases that he's worked on. Ryan Garry

1614 said that "the misconduct and right violations will be addressed you can bet on that".

1615 Ryan Garry saw a number of issues, such as the fact that there was "no probable cause"

1616 against the Plaintiff nor the Plaintiff's brother and that the "continued withdrawal

1617 of attorneys is in itself a right violation." Ryan Garry said he considered this case

1618 an "open and closed case that never should not be taking this long." Ryan Garry

1619 pointed out that we have plenty of Frank's issues and pointed out that Miya Thompson

1620 was the reporting party and not Douglas Daub and that there were 6 levels of hearsay.

1621 Ryan Garry pointed out, along with his partner Elizabeth Duel, a lot of great things

1622 no other attorney had done before. Ryan Garry supposedly sent the Court a motion to

1623 reopen the Omnibus Hearing (which was granted by Judge Rohland under a very limited

1624 scope that would not be able to sway anybody in one direction or the other) and to

1625 also have a Franks Hearing so the Court can hear our challenges against the affidavit.

1626 Judge Rohland ignored the Franks Hearing motion the first time it was sent to the

1627 Court, so Ryan Garry had to re-send it multiple times. At this point the issues were

1628 again, unresolved and Ryan Garry's behavior started to change and he became

1629 immediately defensive of his career and advice to not making the Court angry showing

1630 his true colors of cowardice, contrary to what he so adamantly sold the Plaintiff

1631 when he was first hired.

1632 Eric Olson represented the Plaintiff and would work with Ryan Garry on correcting

1633 all the "errors" and violations in the Plaintiff's brothers' case. Eric Olsen like

1634 previous attorney started out enthusiastic and helped find examples of misconduct and

1635 right violations. Then after a few court appearances his behavior too drastically

1636 changed. Eric Olson then lied and misled the Plaintiff on multiple occasions in person

1637 and via email, contradicting his prior email correspondences regarding court

1638 terminology of certain hearings and misconduct that he himself discovered. He started

1639 switching between two different law firm titles on the letters and emails he would

send the Plaintiff's brother. At this point things started to get strange. When the Plaintiff's brother asked Eric Olson for a reason as to why this was being done, Eric Olson then started a campaign of trying to convince the Plaintiff's brother he was "crazy" while the Plaintiff's brother showed him the letters and emails and pointed at the titles on the pages. Eric Olson would then start to call the Plaintiff's brother a "Conspiracy Theorist" when discussing the right violations that Eric Olson himself discovered. Eric Olson would then request the Plaintiff's brother to obtain his medical records to prove he had Cauda Equina Surgery at the Mayo Clinic and for his doctor to write a written statement on the Plaintiff's brother's behalf. The Plaintiff's brother complied. Once Eric Olson received the medical records, he then accused the Plaintiff via email correspondence of conspiring with the Mayo Clinic in fabricating the whole medical situation. The Plaintiff was astonished by the level of stupidity and unethical behavior displayed by Eric Olson as the Plaintiff's brother was completely aware of the childish psychological tactics Eric Olson was attempting to use against the Plaintiff's brother. The Plaintiff's brother documented this behavior via audio files and saved all email correspondence.

The Plaintiff then informed the Court of his attorneys' behavior and is fed up with dealing with the corruption and misconduct of the Redwood County District Court and the Plaintiff informed the Court that he will not appear at a plea hearing until the civil and constitutional right violations are addressed. The Redwood County District Court issued a warrant for the Plaintiffs arrest in retaliation.

## RELIEF

Federal Injunctive Relief against state court criminal proceedings as well as any and all legal remedies available, stated here or otherwise.

## DEMANDS

If litigation proves unfruitful, the Plaintiff demands that this case go to a Jury Trial so the public can be made aware, corruption and misconduct will not go unpunished, it is a matter of Justice. The Defendants will be held accountable for the actions and the crimes they have committed. Therefore, this case can be used as legal precedent in Criminal Justice Reform by protecting American citizens from misconduct and corruption within our own Government. Additionally, the Plaintiff will be pursuing a class action lawsuit in order to protect American citizens in Redwood Falls County, MN who have suffered at the hands of the Defendants.

The Plaintiff would like to clearly state the relevance of the conspiracy

deprivation of rights against him during his criminal case and its subsequent cover-up attempt, in order to state the impact a civil case will have in the Minnesota Criminal Justice System. The Plaintiff was repeatedly tormented psychologically by the Defendants. The Defendants intimidated the Plaintiff with statements such as "by bringing civil action, you need to be aware of the bigger picture", making clear the impact the Defenses' Judicial, Prosecutorial and Police misconduct has on the U.S. Criminal Justice System. That the misconduct and unethical behavior of all the Defendants will ultimately "result in a re-evaluation and investigation of not only the Plaintiffs case, but every criminal case in Redwood County" in which any of the Defendants have been involved. This will greatly damage the integrity of the US Justice System and further discord between American citizens and their government officials. The Plaintiff is immeasurably saddened by this fact but in no way is responsible for the actions of the Defendants which has led to the Plaintiffs civil complaint.

### DAMAGES

WHEREFORE, due to the Defendants egregious behavior that "Shocks the Conscious", the Plaintiff seeks damages in the amount of $30,000,000.00 (a combined total of the meta-legal profiles of each crime and violation that has been committed) which together with attorney fees and court costs against the Defendants who are government employees. The Plaintiff seeks damages against Defense Attorney Megan Burkhammer in the amount of $250,000.00 including disbarment for life as well as criminal charges. The Plaintiff seeks damages against Defense Attorney Paul Hunt in the amount of $250,000.00 including disbarment for life as well as criminal charges. The Plaintiff seeks damages against Defense Attorney Eric Olson in the amount of $250,000.00 including disbarment for life as well as criminal charges. The Plaintiff seeks damages against Defense Attorney Ryan Garry in the amount of $250,000.00 including disbarment for life as well as criminal charges.

Dated this 9th September, 2019

1709

1710   Redwood County District Attorney's Office

1711   Redwood County District Courthouse

1712   Redwood County Sheriff's Department

1713   Redwood Count – State of Minnesota Board of Public Defenders

1714   City of Morgan Police Department

1715   Judge Patrick Rohland

1716   District Attorney Steven Collins

1717   Assistant District Attorney Jenna Peterson-Haler

1718   Assistant District Attorney Kelly Meehan

1719   Public Defender Joel Solie – Solie Law Office

1720   Public Defender Erica Allex

1721   Redwood County Court Administrator Patricia Amberg

1722   Redwood County Court Reporter Jodi Haen

1723   Redwood County Sheriff's Department Sheriff Randy Hanson

1724   Redwood County Sheriff's Department Chief Deputy Mark E. Farasyn

1725   Redwood County Sheriff's Department Jason Jacobson

1726   Redwood County Sheriff's Department Mitch Zimmerman

1727   Redwood County Sheriff's Department Mike Campbell

1728   Redwood County Sheriff's Department Mike Hubin

1729   City of Morgan Police Department Bostyn Thompson

1730   City of Breckenridge Police Department Kris Karlgaard

1731   Attorney Eric Olson of Olson Defense, PLLC

1732   Attorney Ryan Garry of Ryan Garry, LLC

1733   Attorney Paul Hunt of Karkella, Hunt & Cheshire PLLP

1734   Attorney Megan Burkehammer of Thornton Law Office

**List of Defendants:**

**Steven Collins: #0319752**

MINNESOTA DEPARTMENT OF HEALTH AND HUMAN SERVICES
Admin Law Judge
444 Lafayette Rd
Saint Paul, MN 55155
Phone: 651-431-2000

**Judge Patrick Rohland: #0305339**

REDWOOD COUNTY DISTRICT COURT
250 South Jefferson
P O Box 130
Redwood Falls, MN  56283
Phone: 507-637-4020
Fax: 507-637-4021

**Jenna Peterson (Haler): #0395397**

REDWOOD COUNTY ATTORNEY'S OFFICE
250 South Jefferson
Redwood Falls, MN  56283
Phone: 507-637-4020
Fax: 507-637-4021

**Kelly Meehan: #0390055**

OFFICE OF THE MINNESOTA ATTORNEY GENERAL
Bremer Tower Suite 900
445 Minnesota St.
Saint Paul, MN  55101
Phone: 651-296-3353
Fax: 651-282-9898

**Eric Olson: #0278427**

OLSON DEFENSE, PLLC
8009 34th Ave S.
Suite 800
Bloomington, MN  55442
Phone: 952-835-1088
Fax: 952-835-4660

**Ryan Garry: #0336129**

RYAN GARRY, LLC
333 South Seventh St
Suite 2350
Minneapolis, MN  55402
Phone: 612-436-3051
Fax: 612-436-3052

**Paul Hunt: #0319806**

KARKELLA, HUNT, & CHESHIRE PLLP
450 W Main St
Perham, MN  56573
Phone: 218-346-4995
Fax: 218-346-4405

**Megan Burkhammer: #0386588**

THORNTON LAW OFFICE
1017 Broadway St
P O Box 819
Alexandria, MN  56308
Phone: 320-762-2361
Fax: 320-762-1638

**Joel Solie: #0199643**

SOLIE LAW OFFICE
229 S Mill St.
P O Box 74
Redwood Falls, MN  56283
Phone: 507-637-5500

**Erica Allex: #0389666**

STATE OF MINNESOTA BOARD OF PUBLIC DEFENSE
432 Litchfield Ave SW
Willmar, MN  56201
Phone: 320-231-6064
Fax: 320-231-6065

**Patricia Amberg – Court Administrator**

REDWOOD COUNTY DISTRICT COURT
250 South Jefferson
Redwood Falls, MN 56283
Phone: 507-637-4020
Fax: 507-637-4021

**Jodi Haen – Court Reporter**

REDWOOD COUNTY DISTRICT COURT
250 South Jefferson
Redwood Falls, MN 56283
Phone: 507-637-4020
Fax: 507-637-4021

**Randy Hanson – Redwood County Sheriff**

REDWOOD COUNTY SHERIFF'S OFFICE
303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**Bostyn Thompson – Morgan Police Chief**

MORGAN POLICE DEPARTMENT
119 Vernon Ave
Morgan, MN 56266
Phone: 507-249-3777
Fax: 507-641-5736

**Mark Farasyn – Redwood County Chief Deputy**

REDWOOD COUNTY SHERIFF'S OFFICE
303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**Jason Jacobson – Redwood County Deputy**

REDWOOD COUNTY SHERIFF'S OFFICE
303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**Mike Hubin – Redwood County Deputy**

REDWOOD COUNTY SHERIFF'S OFFICE
303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**Mike Campbell – Redwood County Deputy**

REDWOOD COUNTY SHERIFF'S OFFICE
303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**Mitch Zimmerman – Redwood County Deputy**

REDWOOD COUNTY SHERIFF'S OFFICE
303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**Kris Karlgaard – Breckenridge Police Chief**

BRECKENRIDGE POLICE DEPARTMENT
515 Dacotah Ave
Breckenridge, MN 56520
Phone: 218-643-5506
Fax: 218-643-9115

**REDWOOD COUNTY ATTORNEY'S OFFICE**

250 South Jefferson
Redwood Falls, MN  56283
Phone: 507-637-4020
Fax: 507-637-4021

**REDWOOD COUNTY DISTRICT COURT**

250 South Jefferson
P O Box 130
Redwood Falls, MN  56283
Phone: 507-637-4020
Fax: 507-637-4021

**STATE OF MINNESOTA BOARD OF PUBLIC DEFENSE REDWOOD COUNTY**

601 Jewett St. Suite A
Marshall, MN 56258
Phone: 507-537-6062
Fax: 507-537-6857

**REDWOOD COUNTY SHERIFF'S OFFICE**

303 E 3rd St
Redwood Falls, MN 56283
Phone: 507-637-4036
Fax: 507-637-4007

**CITY OF MORGAN POLICE DEPARTMENT**

119 Vernon Ave
Morgan, MN 56266
Phone: 507-249-3777
Fax: 507-641-5736